**UNITED STATES of America, Plaintiff, Appellee,**

v.

**Joseph DiGREGORIO, Hermis Yanis, Jr., Ruben Badillo, John Delvecchio, Defendants, Appellants.**

**Nos. 78–1468 to 78–1471.**

United States of Appeals, First Circuit.

Argued June 5, 1979.

Decided Aug. 14, 1979.

Certiorari Denied Oct. 29, 1979. See 100 S.Ct. 287.

Harvey Brower, Lawrence, Mass., for appellant Joseph DiGregorio.

Stanley M. Meyer, Brooklyn, N.Y., with whom Meyer, Light & London, Brooklyn, N.Y., was on brief, for appellants, Hermis Yanis, Jr. and Ruben Badillo.

William A. Brown, Boston, Mass., by appointment of the court, for appellant John Delvecchio.

Deborah Watson, Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Martin D. Bou-dreau, Sp. Atty., Boston, Mass., and Joseph S. Davis, Jr., Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal from convictions for conspiracy and substantive acts in violation of the Hobbs Act. 18 U.S.C.A. § 1951. All four appellants were convicted of conspiracy to obstruct interstate commerce by extortion and of the substantive act of using threats and physical beating pursuant to a plan of extortion. All but appellant Delvecchio were also convicted of obstructing interstate commerce by shooting the manager of an interstate business pursuant to a plan of extortion.[1] Some or all of appellants now raise challenges to virtually every stage of the criminal process. We affirm.

An abbreviated statement of facts will suffice to put the issues discussed below in context. More detail accompanies the discussion of each issue. In 1973, Chick's Construction Company undertook to build a new school for the town of Millbury, Massachusetts. John Innamorati, the President of Chick's, hired the DiGregorio Construction Company to do preliminary excavation work. Innamorati was not satisfied with the progress of the work and, after renegotiation attempts failed, ejected DiGregorio from the site in January of 1974. DiGregorio sued Chick's for breach of contract.

While the lawsuit languished, the project was completed in 1975. Apparently dissatisfied with legal process, in February of 1977 Vincent DiGregorio and his son Joseph hired two men, Donomura and Hughes, to "settle" the dispute for a 10 per cent commission. Innamorati then began receiving anonymous phone calls and eventually a personal visit from DiGregorio's persuaders on March 3. Innamorati explained he was not prepared to pay the $52,000 demanded by DiGregorio because the work done had not merited such payment. DiGregorio's agents made no demands at that meeting.

---

1. A fifth defendant, Anthony Mojeda, was acquitted of all three charges.

In April, Innamorati received more anonymous calls, some of them threatening. The calls were later traced to appellant Yanis through toll records. On April 27, appellants Delvecchio and Badillo visited Innamorati at his office, beat and robbed him, and threatened to kill him if he did not pay DiGregorio $75,000.[2] Upon his release from the hospital, Innamorati met with Donomura and Hughes, who offered to stop the harassment for a fee of $5000. Innamorati paid half the amount and then fled to Virginia, returning several days later.

John Innamorati's brother Arthur then received a threatening call. The Innamoratis called in the FBI. Negotiation with the DiGregorios ensued, and the threatening calls continued. The calls were traced to appellant Yanis' home. On June 23, John Innamorati was hit by number six shot fired from a 12 gauge shotgun as he unlocked the front door to his offices. A witness identified Badillo as the driver of a car seen approaching the office seconds before the shooting.

FBI agents went to the Yanis home soon after the shooting and were admitted by Yanis' wife. Appellants Delvecchio, Badillo, and Yanis were sitting around the kitchen table. Two 12 gauge shotguns, an empty box of 12 gauge, number six shotshells, papers connecting the appellants to DiGregorio, and papers containing the Innamoratis' names and phone numbers were found in the house.

*Search and Seizure Issues*

Appellants Yanis and Badillo argue that the trial court erred in refusing to suppress evidence discovered at Yanis' home on the day of the shooting.

The trial court found the following facts on a more than adequate record. Prior to the shooting, telephone threats to Innamorati had been traced to appellant Yanis' residence phone. After the shooting, FBI agents immediately focused their investigation on Yanis. Hourly checks of his residence revealed that someone was coming and going in his red Maverick automobile. When agents arrived at 10:45 a. m. to question Yanis, his wife answered the door and stated that she was separated from her husband, who was now living at an address she supplied to the agents. The agents checked the address and found that Mrs. Yanis had lied. They returned to the Yanis residence to find that the Maverick had apparently again been used (it had been moved), and that Mrs. Yanis was about to depart with her young child. The agents confronted Mrs. Yanis, stating that they needed to talk to her husband about a very serious matter that might involve a murder charge. She became very upset and disclaimed any knowledge of a murder plot. Because curious neighbors had begun to watch the exchange, she acquiesced in the agents' suggestion that they discuss the matter inside.

Mrs. Yanis led the agents through a front door, up a flight of stairs to a landing, through an apartment door, and through two intervening rooms into the kitchen. She made no attempt to raise an alarm. Upon entering the kitchen, the agents observed Yanis, Badillo, Delvecchio and Mojeda sitting around the kitchen table. They also observed a shotgun leaning against the refrigerator. Yanis identified himself, but the other three men said they had no identification. Badillo, Delvecchio, and Mojeda agreed to accompany an agent to the FBI office in Worcester. The remaining agent "secured" the premises by informing Mr. and Mrs. Yanis that they were free to go but that they could not remove any property from the residence pending issuance of a search warrant. Upon the agent's request, appellant Yanis retrieved a number of other weapons in the house and placed them on the living room couch.

A short while later, while observing Yanis' movements in the house, the agent noticed a wallet placed on a chair pushed under the kitchen table. Yanis disclaimed any knowledge of or interest in the wallet. It contained papers identifying Delvecchio, as well as a slip of paper with the handwritten name of Joseph DiGregorio. The agent placed the wallet on the kitchen table and

---

2. Mojeda was also accused of participating in the beating.

later foiled several attempts by Yanis to smuggle it out of the house.

The agent remained in the house until a search warrant was obtained and executed. The agent refused to comply with demands by Mrs. Yanis, and, later, by her attorney that he leave the premises. Execution of the warrant revealed further incriminating items.

On this record, the trial court found that Mrs. Yanis consented to the initial entry, the shotgun and wallet were seized within the plain view exception, the additional weapons were secured within the agent's limited right to secure the area of control occupied by Yanis, and the securing of the premises pending issuance of the search warrant was permissible given the exigencies of the situation. We agree.

■ On the issue of consent to entry, appellants encapsulate their argument by stating, "We believe that the facts testified to by the FBI agents were ludicrous." Such arguments are properly addressed to the trial court as finder of fact. The trial judge expressly found Mrs. Yanis' testimony that the agents forced their way in to be incredible. That finding was supported by the more than plausible testimony of the agents that Mrs. Yanis had no desire to actively obstruct a murder investigation, did not want to discuss the matter in the street, and had ample opportunity to warn the defendants of the agents' entry but did not try to do so. We see nothing that would upset the trial court's credibility finding. Moreover, we believe the circumstances here were not so inherently coercive as to negate a finding of consent to entry as a question of law. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Miller*,

589 F.2d 1117, 1130–32 (1st Cir. 1978); *Robbins v. MacKenzie*, 364 F.2d 45 (1st Cir.), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966).

■■ Once legitimately on the premises, the agents had a right to seize what was evidence in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The shotgun was obviously evidence when found in the possession of a man who had threatened to injure Innamorati. As for the wallet, no privacy interests could attach to it once Yanis disclaimed any interest. *See United States v. Miller, supra*, at 1131.

■ We also think that the circumstances permitted the agents to ask Yanis if there were any more weapons in the house.[3] Finally, we reject appellants' generalized complaints that it was unreasonable to "secure" the premises for eight hours pending the issuance of a warrant. So long as no general warrantless search is undertaken, when there is probable cause to believe that evidence is located in a house and a likelihood that the occupants will remove or destroy it pending issuance of a warrant (i. e., exigency), it is permissible for an officer already legitimately on the premises to secure the area against removal of property pending issuance of a warrant. *United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978).

### Prosecutorial Misconduct Before the Grand Jury

Appellants Delvecchio and DiGregorio argue that the trial court abused its discretion in refusing to dismiss the indictment on account of prosecutorial misconduct before the grand jury. Appellants argue that the prosecutor violated their rights by intimi-

---

3. We express no opinion concerning the options available to the agent had Yanis refused to reveal whether any additional weapons were located in the house. Since the weapons were turned over voluntarily, we need not decide whether the "securing" of premises pending issuance of a warrant approved in *United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978) and *United States v. Edwards*, 602 F.2d 458 (1st Cir. 1979), would countenance a search for such weapons. The trial court apparently thought "securing" could include such a search, under the theory that the not-yet-arrested defendant retained "immediate control" of the entire house. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). We note, however, that *Picariello* involved a special need to secure the premises from the inside because of the probable presence of dynamite, a threat to the public in general. In contrast, here there was no such threat, and less drastic alternatives (e. g., arresting Yanis and locking the house) were apparently available.

dating a witness before the grand jury and by insinuating that the witness feared for his life at the hands of appellant DiGregorio. Although reprehensible, we do not think the prosecutor's conduct required dismissal of the indictment.

One of the first witnesses before the grand jury, John Lorusso, testified that he had rented a car on behalf of appellant DiGregorio. Lorusso went on to explain that the car was not returned to the rental agency for some time, and he became concerned. DiGregorio then told Lorusso that the car had been impounded by the police and that the two should get together to discuss possible trouble with the law. Lorusso then deviated from his previous statements to the FBI by not recalling DiGregorio's explanation that the rental car had been involved in a shooting. When confronted with the prior inconsistent statement, Lorusso asked to see his attorney. The prosecutor then engaged in a lengthy harangue about the identity and motives of Lorusso's attorney, eventually eliciting testimony tending to show that the attorney had been hired by appellants to keep Lorusso quiet. At that point, the prosecutor admonished Lorusso, again at length, that protecting the targets of the investigation through perjury would not pay off and that appellant should not be afraid of DiGregorio.

■■■ We agree with the trial court that the prosecutor overstepped ethical bounds and came close to tainting the indictment by intimidating the witness and insinuating that the targets of the investigation would harm the witness. *See United States v. Riccobene,* 451 F.2d 586 (3d Cir. 1971). Nevertheless, we see no reversible error. "We note that [appellants do] not allege or even suggest that the evidence before the grand jury was insufficient to support the indictment" absent the testimony coerced from Lorusso and absent the prosecutor's insinuations. *United States v. Bruzgo,* 373 F.2d 383, 386 (3d Cir. 1967). On the contrary, Lorusso freely volunteered enough to support the indictment against DiGregorio.

Nor do we see how Delvecchio was in any way prejudiced by the insinuation that DiGregorio was a dangerous person. Finally, although the tactics used in eliciting · the testimony were objectionable, the substance of Lorusso's story of appellants' attempts to suppress evidence was highly relevant to the grand jury's investigation. We see no "synergistic effect" claimed by appellants to result from the combination of inflammatory conduct and calling the targets of the investigation as witnesses. In sum, any inflaming of the grand jury and insinuation by the prosecutor was harmless. *See Beck v. Washington,* 369 U.S. 541, 555, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).[4]

### Admission of Extrajudicial "Confession" of Nontestifying Coconspirator

Lorusso's testimony about the rental car also gives rise to a complaint by Delvecchio that his rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), were violated. Lorusso testified at trial that DiGregorio explained the loss of the rental car by stating that a stolen car had been used to drive to the scene of the shooting and the rental car had been used in the getaway. Defendant-appellant DiGregorio claimed his privilege not to testify. The trial court admitted Lorusso's testimony without any limiting instructions. Delvecchio claims that DiGregorio's out of court statements amounted to an extrajudicial confession by a nontestifying accomplice, implicating Delvecchio while denying him his Sixth Amendment right of confrontation. *See Bruton v. United States, supra.*

As an initial matter, our reading of the trial transcript reveals that both the *Bruton* problem and the possible application of the coconspirator hearsay exception (*see* F.R. Evid. 801(d)(2)(E)) were argued to the trial court, in a lengthy discussion at the side bar. If DiGregorio's statements to Lorusso fell within the coconspirator hearsay exception, there would be no *Bruton* problem as to Delvecchio. *See Dutton v. Evans,* 400 U.S. 74, 80–83, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (upholding Georgia's coconspirator

---

**4.** We reject as frivolous appellants' claims that the prosecutor's violation of Lorusso's Sixth

Amendment right to counsel created reversible error as to the defendants.

hearsay exception against confrontation clause attack). The trial court, however, did not explain the basis of its ruling; it simply denied all motions to exclude Lorusso's testimony or to limit its applicability to certain defendants. Thus, on appeal the government has argued only the *Bruton* point, apparently conceding the nonapplicability of the hearsay exception even though the statements were made shortly after the shooting and were part of an effort to persuade Lorusso to meet with the defendants and work out a cover story.

■ We have dealt fully with the *Bruton* point in *United States v. Cleveland*, 590 F.2d 24, 28–30 (1st Cir. 1978). As in *Cleveland*, the extrajudicial statement involved here in no way identified Delvecchio as associated with the shooting incident. There was substantial evidence independent of the extrajudicial statement to link Delvecchio to the conspiracy. The fact that a codefendant's admission tended to corroborate the government's case against Delvecchio is simply not enough. This is not a case involving the "powerfully incriminating" effect of one accomplice pointing the finger directly at another, without subjecting himself to cross-examination. *Bruton, supra,* 391 U.S. at 135, 88 S.Ct. 1620; *United States v. Belle*, 593 F.2d 487 (3d Cir. 1979) (en banc).

■ Finally, Delvecchio argues that the prejudice created by the admission of DiGregorio's out of court statement was aggravated by the trial court's refusal to give a limiting instruction. We agree that the use of a limiting instruction played a part in *Cleveland, supra. Bruton* holds that a limiting instruction cannot cure the extreme prejudice created by explicitly naming a codefendant in an un-cross-examined confession that is not admissible against the codefendant. But where the confession does *not* name a codefendant, it may be admitted under *Cleveland* solely against the confessor, and a limiting instruction does serve to reduce any prejudicial inferences the jury might draw. Nevertheless, if a limiting instruction was required here be-

cause DiGregorio's statement did not fall within the coconspirator hearsay exception and because it at least indirectly implicated Delvecchio, we are certain such error was harmless. The statement did not put Delvecchio in the car or at the scene of the shooting, and the jury acquitted Delvecchio of the substantive act of participating in the shooting. Thus, if DiGregorio's statement proved anything about Delvecchio's participation, it did not prove enough to do any harm.

*Effect on Interstate Commerce*

All four appellants argue that the government failed to introduce sufficient evidence to establish an effect on interstate commerce within the meaning of the Hobbs Act. Specifically, appellants argue that the government introduced no evidence showing that Chick's Construction Company was engaged in interstate commerce during the period of the conspiracy and that, assuming such commerce existed, the government failed to prove that the $75,000 demanded would have come from corporate coffers if Innamorati had paid it. We think the evidence was sufficient to bring the acts proven within the scope of the Hobbs Act.

■ Congress intended to use the full extent of its constitutional power when it made extortion affecting commerce a federal crime under 18 U.S.C. § 1951. *United States v. Culbert*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978);[5] *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The government need only show a "realistic probability that an extortionate transaction will have some effect on interstate commerce" in order to establish a federal crime. *United States v. Hathaway*, 534 F.2d 386, 396 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). The effect need only be *de minimis* in any given case, for Congress has decided that the aggregate effect of extortion on commerce is a matter of federal concern. *Id.* A minimal depletion of the resources of a company engaged in interstate commerce or constructing a facility

---

5. We note in passing that *Culbert, supra,* disposes of appellants' erroneous contention that the Hobbs Act is limited to labor racketeering.

for interstate commerce will suffice. *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir. 1978). In short, the government's burden in proving an effect on commerce in a case such as this is not onerous.

■ We agree with appellants that the prosecutor gave extremely short shrift to what is, after all, a jurisdictional requirement.[6] We do not agree that the government failed to carry its burden. There was overwhelming evidence that the construction project giving rise to the dispute between Innamorati and DiGregorio involved the purchase and use of goods moving in interstate commerce. If the conspiracy and extortion charged had taken place while the project was underway, appellants would have no argument. *See Stirone v. United States, supra; United States v. Daley*, 564 F.2d 645 (2d Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978) (extortion from interstate contractors in process of building interstate highway). But the school building project involved here was completed in 1975, and the indictment charged conspiracy and extortion beginning in January of 1976. There was no specific evidence concerning actual or planned construction projects involving Chick's Construction Company during the

period specified in the indictment. On the other hand, Innamorati testified that he is President and Clerk of Chick's and has been for 28 years. Moreover, he testified that Chick's is in the business of school and municipal construction.[7] Since there was clear evidence that Chick's business normally involves purchases in interstate commerce, we think the jury could fairly infer that Chick's was involved in commerce during the period of the conspiracy. Even if Chick's built nothing during the period involved, the extortion could be reasonably thought to interfere with probable future interstate commerce, a sufficient effect to invoke the Hobbs Act. *See United States v. Staszcuk*, 517 F.2d 53 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975) (zoning official extorted payment in consideration of approval of hospital construction that was never undertaken); *United States v. Irali*, 503 F.2d 1295 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) (extortion from potential licensee by liquor license clerk affects future commerce of tavern).[8]

■ Having found that there was sufficient evidence of Chick's involvement in

\* \* \* \* \* \*

Q What type of construction work does your company do, sir?

A We have been involved mostly in schools and municipal buildings."

Although Innamorati's choice of the past tense to describe his company's municipal construction work is somewhat ambiguous, we believe the prosecutor's use of the present tense in his question fairly supports an inference that Innamorati was describing the present business of Chick's.

8. The fact that Chick's had been engaged in interstate business for 28 years undermines appellants' argument based on *United States v. Merolla*, 523 F.2d 51 (2d Cir. 1975). In *Merolla*, the court found no effect on commerce because the contractor who was a victim of extortion had gone into the business solely to build the one project involved. Neither the construction corporation, nor its principal shareholder, had any connection with commerce, other than the project undertaken on behalf of the defendant in the case. Unlike *Merolla*, the commerce involved here was not a "one shot deal". *Id.* at 55.

6. The problem was not attributable to obvious unavailability of evidence on the subject. Rather, the prosecutor proceeded upon a novel theory of effect on commerce but failed to convince the trial judge of the validity of that theory. At trial, the government argued that collection of a debt arising out of interstate commerce by extortionate means affects commerce. The trial court, however, chose to apply the "depletion of resources" theory, *see United States v. Phillips, supra*, specifically charging the jury that they were required to find that commerce existed during the period charged in the indictment. Thus, even if the prosecutor's theory is legally correct, there is no way the jury's verdict can be read as supporting that theory.

7. For the sake of thoroughness, we set forth the relevant testimony:

"Q How long have you been in business as Chick's Construction Co., Inc., sir?

A 28 years.

Q What is your position with the company, Mr. Innamorati?

A I'm president and clerk.

Q Have you held those positions since the formation of the company, sir?

A Yes, sir.

commerce during the period in question, we turn next to the problem of who would have been affected by the payment demanded.[9] We think appellants' argument on this issue a bit far fetched. Innamorati's testimony revealed that he was a chief executive officer of the company. The alleged debt arose out of company business. The evidence supported an inference that he was a principal, if not the sole owner of the business. Given these facts, we think the jury would be compelled to infer that the payment, if made, would ultimately deplete corporate coffers, if not through direct payment by the corporation then through reimbursement of the corporate officer who was coerced into paying a corporate debt. *See United States v. Augello,* 451 F.2d 1167 (2d Cir. 1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972) (threats to the person of owner-operator of small corporate business while demanding "protection" money relating to operation of business affect the corporation). Finally, quite apart from who would have paid the $75,000, we think that the defendants succeeded in "commit[ting] or threaten[ing] physical violence . . . in furtherance of a plan or purpose to" violate the act by extortion that affects commerce. 18 U.S.C. § 1951(a). The plan involved frightening Innamorati into paying the $75,000. The plan succeeded so well that the leading executive officer and chief decisionmaker of an interstate business fled the state.

*"Multiple" Conspiracies*

■ Appellants Yanis and Badillo argue that the government impermissibly amassed evidence showing two separate conspiracies in a single trial, thereby tarring these two appellants with an inapplicable brush. Specifically, appellants argue that DiGregorio first conspired with unindicted coconspirators Donomura and Hughes to threaten Innamorati. When friendly persuasion failed, DiGregorio started an entirely new conspiracy in which Badillo beat and both appellants shot the victim. Finally, appellants argue they were prejudiced not only by guilt by association with the prior conspiracy but also by their attorneys' surprise when the trial judge announced at the end of the case that evidence of DiGregorio's machinations with Donomura and Hughes was admissible against all the defendants. We are unimpressed.

The evidence showed that DiGregorio first hired Donomura and Hughes to engage in "mild" persuasion. When that failed, he continued the same scheme by hiring the appellants to first beat and then shoot Innamorati. We think the evidence clearly established that appellants knew the general aims of the overall plan, associated with the originator of the conspiracy, and engaged in conduct to promote the scheme. *See Blumenthal v. United States,* 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Moreover, even if we were not convinced that the evidence in this case showed a classic "wheel" conspiracy in which each of the spokes had at least a general knowledge of the others' existence, we could say without hesitation that "[t]his was not a case involving 'the dangers of transference of guilt from one to another across the line separating conspiracies, subconscious or otherwise . . . .'" *United States v. Almonte,* 594 F.2d 261, 264–65 (1st Cir. 1979) (*quoting Kotteakos v. United States,* 328 U.S. 750, 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Independent evidence clearly established that these appellants beat and shot Innamorati. We fail to see how evidence that others threatened, but did not commit, such acts prejudiced appellants.

---

**9.** Like the first problem of proof on the commerce issue, the paucity of proof on the source of the payment was more a matter of oversight than a problem of unavailable evidence. The prosecutor attempted to show the potential source of the payment without first laying a foundation showing the company was engaged in commerce. The defendant successfully objected on relevancy grounds. Once proof of involvement in commerce was in, however, the prosecutor neglected to return to his initial line of questioning.

Finally, we have little sympathy with appellants' attorneys, who claim surprise at the late ruling on admissibility against Yanis and Badillo. In a conspiracy trial involving five defendants and three more unindicted coconspirators, it is inevitable that some evidence will be admitted conditionally pending the trial court's finding that sufficient evidence of a conspiracy exists to attribute that evidence against other coconspirators. There was no unfair surprise.[10]

*Affirmed.*

10. Appellant Delvecchio's remaining contentions do not merit extensive discussion. The challenge to a ten-month pre-indictment delay must fail both because appellant has not alleged sufficient prejudice, *United States v. Marion*, 404 U.S. 307, 321–22, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), and because the motion was not raised until the first day of trial. F.R. Crim.P. 12(b)(2). Nor are we convinced that the trial court abused its discretion in refusing to enter a judgment of acquittal at the close of the prosecutor's opening statement. The prosecutor relied on the indictment, which was read to the jury, as the core of his opening statement, and the content of this document clearly meets the minimum standard we set forth in *United States v. Oliver*, 570 F.2d 397 (1st Cir. 1978).