**UNITED STATES of America,
Appellee,**

v.

**Joseph P. MURPHY, Defendant,
Appellant.**

No. 98–2035.

United States Court of Appeals,
First Circuit.

Heard Aug. 6, 1999.

Decided Sept. 30, 1999.

James C. Rehnquist with whom Goodwin, Procter & Hoar LLP was on brief, for appellant.

Ben T. Clements, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, and S. Theodore Merritt, Assistant United States Attorney, were on brief, for the United States.

Before SELYA, BOUDIN and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

Joseph Murphy, a criminal defense lawyer, was indicted on charges that he participated in an extortion scheme with two Boston police detectives. The detectives, Kenneth Acerra and Walter Robinson, pled guilty to a number of offenses involving a much greater range of misconduct than that for which Murphy was charged. But Murphy stood trial, was convicted by a jury, and now appeals. The evidence offered by the government at trial permitted the jury to find that the following occurred.

Over a substantial period starting in 1990 and extending to 1996, Acerra and Robinson engaged in a scheme that included obtaining warrants based on information supplied by them and known by them to be false. Acerra and Robinson made a number of searches and seizures using warrants based on such falsified applications before and after the Murphy incidents. In the raids, the detectives seized cash, representing drug sale proceeds, that they kept for themselves instead of turning it over to the Boston Police Department. Theft, not extortion, was the central element in these crimes.

The two incidents involving Murphy and leading to the extortion charges against him both occurred in 1992. The first began on May 6, 1992, when a third detective, John Brazil, obtained search warrants to search an apartment on Forest Hills Street in Jamaica Plain and a taxicab owned by Bruno Machore. Brazil prepared the warrant applications at Acerra's direction, fabricating most of the "facts" alleged in the applications. The warrants were executed by all three detectives, cocaine and $10,000 in cash were seized, and Machore and two others were arrested and held on state charges. Apparently fearing that someone would reveal the seizure of cash, the detectives reported to their superiors that they had seized $7,500; they kept the balance for themselves.

After Machore's arrest, Murphy (who was Machore's attorney) told him that for payments of $1,000 each to Acerra and Robinson the case would · be dismissed. Machore agreed, believing the money would come from the seized funds. In an initial effort to obtain dismissal, all three detectives failed to appear at Machore's district court trial; but no dismissal was obtained since Machore had not been brought from jail to the trial court. Thereafter, Robinson managed to get the case against Machore dismissed by conveying untrue information about the case to the assistant district attorney.

Murphy then moved for the return of the $7,500 on the ground that it had been improperly seized, and based on false statements by Robinson and without objection from the prosecutor, the judge ordered a return of the money. Murphy had Machore authorize the attorney to receive the $7,500 from the Boston Police Department. Murphy obtained the money on June 29, 1992, put $1,500 in his business account, and took out the balance in cash; whether some was then paid to the detectives is unknown. In any event, none of the money was ever returned to Machore.

The second incident began even before the first one ended, on May 29, 1992, when Acerra and Robinson obtained warrants (again, based on false statements) to search two apartments in a building on

Edgemere Road in West Roxbury. Machore and his associate, Francisco Almonte, used one apartment to store cocaine and the other for drug sale proceeds and as living quarters. Using the warrants, detectives, including Acerra and Robinson, conducted searches of the apartments on May 29, 1992, and seized cocaine and between $16,000 and $17,500 in cash. None of the cash was reported to the Boston Police Department.

Almonte, Machore and two others were arrested in connection with these new searches. Murphy, representing Machore, told the latter that this time Robinson and Acerra wanted a total of $50,000 for the release of Machore and his three co-defendants. Since it was believed that Almonte had access to money, Murphy visited Almonte in jail four times (always without the knowledge of Almonte's own attorney). Murphy advised Almonte of the $50,000 demand and brushed aside Almonte's suggestion that the funds just seized from the Edgemere Road apartments might count toward the larger amount now demanded.

Since neither Almonte nor Machore had cash available, a plan developed to get them released from jail so that they could raise the $50,000. Murphy explained to Almonte, and also to Machore's girlfriend (who was Almonte's sister), that the detectives would fail to appear at the grand jury, leading to the release of the defendants under a state law that required release when a grand jury does not indict within two sittings. From July to September 1992, Robinson failed to appear at the grand jury five times in a row, and Machore and two of his co-defendants were eventually released.

Almonte was kept in jail on another case. Machore and Almonte were thereafter indicted on drug charges incident to the Edgemere Road seizure. When he was released on bail about two weeks later, Almonte was called in by Murphy and told that the detectives had done their part and "now it's your turn." Instead of paying, Almonte went to trial and was acquitted, due in part to the fact that none of the detectives testified about finding any money in the apartment in which Almonte was arrested. Much later, when an investigation began into the detectives' warrant practices, Murphy made false statements to help conceal the detectives' failure to report funds seized in both of the incidents.

In March 1997, Robinson, Acerra and Murphy were indicted in federal district court. On October 2, 1997, an amended superseding indictment against all three defendants was returned. While the indictment charged the detectives with a broad scheme and many wrongful seizures, Murphy was named in only three counts: count 2, based on both of the incidents just described, charged Murphy (and the two detectives) with conspiracy to commit extortion under color of official right, 18 U.S.C. § 1951; and counts 3 and 4, under the same statute together with the aiding and abetting statute, *id.* § 2, charged extortion (based on the first incident) and attempted extortion (based on the second).

The two detectives pled guilty in March 1998 to a broadly framed conspiracy count and two other offenses. Murphy's trial took place in April 1998 and included government testimony from Brazil and Machore, among others. The jury found Murphy guilty on all three counts. Thereafter, in August 1998, the district court sentenced Murphy to 24 months imprisonment. Murphy now appeals, challenging both his conviction and his sentence.

█ Murphy's first ground of appeal concerns alleged errors by the district court in admitting what Murphy claims were hearsay statements under the coconspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E).[1] In this circuit, a predicate to the admission of hearsay

1. The rule reads in pertinent part: "A statement is not hearsay if ... [it] is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

evidence under the co-conspirator exception is a finding by the district judge that a conspiracy existed of which the defendant was a member, and that the statement was made in furtherance of that conspiracy. *See United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). Murphy argues that the district judge did not make a timely *Petrozziello* finding of conspiracy before the case went to the jury, that the *Petrozziello* finding made after the jury returned with the verdict was erroneous, and that the admission of the alleged hearsay was prejudicial and did not constitute harmless error.

■ Although the government says that the hearsay objection was not preserved, the point is debatable and it is easier to deal with the claims on their merits. A number of the specific statements to which Murphy objects on appeal were from Brazil's testimony. The gist of some of these statements was that Robinson and Acerra had a practice of instructing Brazil to falsify information in warrant applications and further instructing him not to report moneys seized in subsequent raids conducted pursuant to such warrants. Brazil testified that he was generally so instructed in other, unnamed incidents and, specifically, that he was told to falsify the May 6 warrant applications and not to report the May 29 seizure (as previously described).

Whether the detectives' conduct in other, unspecified incidents should be made known to the jury had been the subject of disagreement prior to trial. In resolving an *in limine* motion to suppress filed by Murphy, the district court had concluded, over objections based on relevance and prejudice, that the government could offer evidence of the detectives' general practice of falsifying warrants and not reporting

cash, but that evidence as to specific instances must be confined to the two incidents involving Murphy. When the general practice evidence was offered at trial, Murphy says that he made an adequate hearsay objection and that the court rejected the objection, relying on the co-conspirator exception.

As it happens, the bulk of Brazil's "instruction" evidence in question was not hearsay at all. Hearsay is an out-of-court statement offered as evidence of the truth of the matter asserted therein, Fed. R.Evid. 801(c); and while Brazil certainly testified to statements made by the detectives out of court, those statements— namely, the instructions given to Brazil to falsify applications and withhold information about seizures—were not offered for the truth of the matter asserted but rather to show that the detectives gave such instructions. For the most part, the out-of-court statements in question were simply directions (*e.g.*, to make false statements in the warrant applications) and not statements of fact at all.

■ Murphy objects that the statements were not "verbal acts" (*e.g.*, the "I accept" that shows that an agreement has been formed), but that is beside the point. Verbal acts are simply one example among many of out-of-court statements offered for something other than their truth.[2] So long as out-of-court statements are not offered for their truth, they are not hearsay, *see Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 575 (1st Cir.1989); it is unnecessary to fit such statements into one particular category, like verbal act, although this is often done, primarily as a short-hand way of explaining the non-hear-

---

2. For example, an out-of-court statement might be offered to show that the declarant had certain information, or entertained a specific belief, or spoke a particular language; or it might be offered to show the effect of the words spoken on the listener (*e.g.*, to supply a motive for the listener's action). *See generally* 5 *Weinstein's Federal Evidence* § 801.03[4], at

801–14.1 to 801–15 (2d ed.1999). Of course, where a statement is offered for non-hearsay uses, the defendant may be entitled to an instruction limiting its use, Fed.R.Evid. 105, but only if he asks for it. *See Staniewicz v. Beecham, Inc.*, 687 F.2d 526, 531 (1st Cir. 1982).

say purpose for which the statement is offered.

Here, Brazil's testimony as to what the other detectives told him to do showed that the detectives' method of operation was to use false warrant applications and not to report seized cash. Such evidence tended to support other evidence from Brazil that the detectives took similar steps in the two episodes in which Murphy was involved and this, in turn, was pertinent to showing Murphy's role in the two extortion efforts growing out of the two seizures. Whether or not the proof of general practice was more prejudicial than probative is a different issue raised in the district court but not here pursued by Murphy. Nor does Murphy appear to have claimed that the testimony was character evidence restricted by Fed.R.Evid. 404(a).

Since the out-of-court statements just described were not hearsay, why then did the district court make a *Petrozziello* finding at all? The main answer is that *other* out-of-court statements by Acerra and Robinson, concerning the very episodes at issue in Murphy's trial, were (or arguably were) offered for their truth. Those statements were thus hearsay and so inadmissible against Murphy (absent some other exception) unless the district court found that Murphy was part of a conspiracy and that the statements were made by a fellow conspirator (Acerra or Robinson) during and in furtherance of the conspiracy. This hearsay label is most easily applied to the next piece of testimony objected to by Murphy on this appeal.

Specifically, Brazil testified that at the police station on the night of the Edgemere Road search, he heard Robinson say that he knew Machore's attorney (*i.e.*,

Murphy) and "words to the effect that 'I know the attorney, I'll talk to him, we can work this out,' words to that effect." Robinson's statement—seemingly pure hearsay—that he knew Murphy helped explain Murphy's early appearance as a go-between; whether the balance of the sentence, expressing Robinson's intention to have a discussion with Murphy, would be subject to a hearsay objection depends on how one interprets the state of mind exception, Fed.R.Evid. 803(3), and associated case law. In all events, admissibility of at least part of the full statement depended on the *Petrozziello* finding.[3]

■ This brings us to Murphy's dual attack on the *Petrozziello* finding. On the factual side, Murphy's argument is in substance that the district judge confused two different conspiracies, the broad continuing conspiracy (from 1990 through 1996) between Acerra and Robinson to commit unlawful seizures and keep the proceeds and the narrower extortion conspiracy (from May through September of 1992) to which Murphy was a party. The distinction matters: statements made solely in the course of the former would not be admissible against Murphy under the co-conspirator exception because (according to the government) Murphy never became a member of that conspiracy. Fed.R.Evid. 801(d)(2)(E); *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.1980); *Petrozziello*, 548 F.2d at 23.

This charge builds on an ambiguity in the district court's own statements. After the verdict, the district court found, as required by *Petrozziello*, that "there was a specific conspiracy between Mr. Murphy, Mr. Robinson, and Mr. Acerra to obtain money through means of extortion" and

---

**3.** The final piece of testimony objected to by Murphy on appeal is Machore's testimony that on May 6, he told Acerra that his attorney was Murphy and Acerra replied, "Oh, you've got a good lawyer." Strictly speaking, each statement arguably has a legitimate non-hearsay use (specifically, to show that Acerra had reason to think that he should contact

Murphy and that Acerra already knew, or knew of, Murphy). For these purposes, it is irrelevant whether Murphy was in fact Machore's attorney or was or was not a good lawyer. *See generally* 5 *Weinstein's Federal Evidence, supra,* § 801.03[4], at 801–14.1 to 801–15.

"conspiratorial preparation and conspiratorial coverup...." But in explaining the import of the finding, the district court used words arguably suggesting that the finding supported not only the admission of out-of-court statements made by Robinson and Acerra *during* the extortion conspiracy but also some made *before* the extortion conspiracy's formation.

Of course, the co-conspirator exception operated against Murphy only as to statements made during a conspiracy of which he was a member (although they could have been made before he joined, *see United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. Goldberg*, 105 F.3d 770, 775–76 & n. 1 (1st Cir.1997)). The government does not claim to have proved that Murphy was ever a member of the broader conspiracy and, indeed, early in the case disclaimed any such intention. Thus, to the extent that the detectives made out-of-court statements before the extortion conspiracy began, they could not be offered against Murphy for their truth. If the district court thought otherwise (which we very much doubt), it was mistaken.

But the mistake, if there was one, had no consequence. The detectives' general practice of false warrant applications and unreported cash seizures was proved, as already noted, by Brazil's non-hearsay testimony as to the instructions he was given. If somewhere in Brazil's testimony there was also some real hearsay to the same effect—and none is clearly identified by Murphy—it was duplicative and harmless. Nor does Murphy try to identify any other specific out-of-court statements of the two detectives, not made during the narrower extortion conspiracy, that were admitted against him for their truth.

■ This brings us to Murphy's procedural attack on the *Petrozziello* finding. The finding, clearly necessary for admission of hearsay statements of the detectives made during the extortion conspiracy, was rendered by the trial judge *after*

the jury verdict. Indeed, prior to jury deliberations, the district judge told counsel that the finding would be made after the verdict, by which time the judge would have had an opportunity to review the trial evidence. This delay, says Murphy, was error and should invalidate the finding (and evidence admitted pursuant to it) because this court's precedent allegedly requires the finding before the case goes to the jury. *See Ciampaglia*, 628 F.2d at 638.

Well, yes and no. The case law in this circuit anticipates that the finding will be made after all of the evidence is in but before the case goes to the jury. The case law explicitly provides that the *Petrozziello* finding should be based on *all* of the evidence, *see Ciampaglia*, 628 F.2d at 638, which explains why the judge must wait until all parties have presented their cases. And, of course, trial counsel normally need to know, before they sum up and argue about the evidence to the jury, whether the evidence to be considered by the jury in its deliberations will include hearsay statements provisionally admitted (in the expectation that "all" of the evidence may lead to an affirmative *Petrozziello* finding).

But we are confident from reading the transcript that defense counsel knew before closing arguments that the jury was going to be allowed to consider the co-conspirator hearsay statements in its deliberations. In all likelihood, the district court assumed that counsel understood that the statements were now to be treated as admitted—since the jury, having heard the testimony, was not being told to disregard it—and that the court was postponing its formal finding so that it could review the trial evidence at greater leisure. This, in turn, would permit the district court more easily to bolster its finding with specific record references.

■ An explicit *Petrozziello* finding, before the case goes to the jury, is surely the better practice (absent very unusual circumstances). But if there was any doubt

in defense counsel's mind as to the evidence properly subject to closing argument and jury consideration, counsel should have asked for a ruling by the court.[4] Here, no such inquiry was made when the district court said that it was postponing its formal finding. And, when the prosecutor in closing argument relied explicitly on an arguable hearsay statement previously recounted (the "we'll work something out" colloquy), defense counsel did not object. Of course, the district court would have faced some difficulty if its post-verdict review of the record had persuaded it to come out the other way on its formal *Petrozziello* finding, but that interesting problem did not arise.

■ We turn now to Murphy's second, and quite different, ground of appeal. At sentencing, the district court refused Murphy's request to adjust his offense level downward to reflect his claim that he had played only a "minor" or "minimal" role in the offense. U.S.S.G. § 3B1.2. This is normally a fact-bound decision, reviewed only for clear error and rarely reversed. *See, e.g., United States v. Mateo-Sanchez,* 166 F.3d 413, 417 (1st Cir.1999); *United States v. Gonzalez-Soberal,* 109 F.3d 64, 73 (1st Cir.1997). However, in denying the adjustment, the district court said the following:

> Now, turning to the question of adjustment for role in the offense, I don't want to spend too much time on that. I view the role that Mr. Murphy had to be not a minor role, not a minimal role. It's really at the core of what goes on in these kinds of transactions. There is a middle man. Mr. Murphy was found to be that middle man. I find it to be shown to a fair preponderance of the evidence that he was. I do not find any

basis for adjusting the role in the offense.

■ Murphy now argues that the district court denied the adjustment on the premise, mistaken as a matter of law, that middlemen in extortion schemes are automatically disqualified from minor or minimal role adjustments. He invokes cases where appellate courts have reversed because they thought that such a categorical approach had been used in lieu of an assessment of the defendant's specific actions; for example, in one case, the sentencing judge used language suggesting to the appeals court that he thought the adjustment was always and forever unavailable to drug couriers regardless of circumstances. *See United States v. Campbell,* 139 F.3d 820, 821–22 (11th Cir.1998)[5]; *see also United States v. Donaldson,* 915 F.2d 612, 615 (10th Cir.1990).

The line between categorical and case specific refusals to decrease offense levels is more blurred than most courts acknowledge because descriptive terms, applied to individuals, are themselves categories (*e.g.,* drug courier; middle man). What is needed, if sentencing judges are not to be forced to read boilerplate from scripts, is use of common sense in determining what the judge meant. Here, we think that the district court meant only that Murphy as the middle man played a central part in this extortion scheme; and we are sure, or at least sure enough to eschew a remand, that the court was not expressing a per se rule disqualifying every "middle man" in an extortion scheme from showing that his role in the case at hand was in fact minor or minimal.

■ Murphy also refers us to the statements in the guideline commentary that the minimal role adjustment is "in-

---

4. Apart from the implication that counsel understood what was happening, this court has said that an objection to the lack of a timely *Petrozziello* finding can be waived. *See Ciampaglia,* 628 F.2d at 638; *see also United States v. Richardson,* 14 F.3d 666, 669 (1st Cir. 1994).

5. After the briefs in this case were submitted, the decision in *Campbell* was vacated by the Eleventh Circuit Court of Appeals. *See United States v. Campbell,* 181 F.3d 1263 (11th Cir.1999).

tended to cover defendants who are plainly among the least culpable of those involved" in a group crime, U.S.S.G. § 3B1.2, comment. (n.1), and that the minor role adjustment is available for one "who is less culpable than most other participants" but whose role was not "minimal." *Id.*, comment. (n.3). However, this language has not been read to make the "least" or "less" culpable person in a given group crime automatically entitled to the adjustment. *See United States v. Royal,* 100 F.3d 1019, 1030 (1st Cir.1996); *United States v. Ocasio,* 914 F.2d 330, 332–33 (1st Cir.1990).

 Rather, the defendant must be less culpable than the ordinary average participant in such crimes and not just relative to those with whom he perpetrated the crime. *See United States v. Nunez–Rodriguez,* 92 F.3d 14, 24 (1st Cir.1996); *Ocasio,* 914 F.2d at 332–33. Otherwise, a substantial participant might get an adjustment just for being less important than others. Given the knowing and important role played by Murphy here, it was not clear error to deny him the adjustment.

 Murphy's next objection to his conviction is that the prosecutor offered leniency in state proceedings to Machore and other witnesses against Murphy, as well as unidentified "immigration assistance." The objection, made in a motion for a new trial that the district court denied, was based on the Tenth Circuit's later discarded decision in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998), *vacated,* 165 F.3d 1297, 1298 (10th Cir.1999) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999), treating leniency and other benefits as "a thing of value" offered to a witness in violation of 18 U.S.C. § 201(c)(2). Although Murphy understands that the original *Singleton* decision was overturned in its own circuit and widely disapproved of elsewhere, *see United States v. Ramsey,* 165 F.3d 980, 986–87 (D.C.Cir.1999) (collecting cases), he urges on us a more limited version of *Singleton.*

Murphy argues that it is one thing for the prosecutor to offer an implicated co-defendant a plea bargain in the case at hand and altogether different and less defensible to offer to help the defendant in unrelated state criminal proceedings or to offer immigration assistance (presumably, help in avoiding deportation or regularizing a doubtful status). The former, says Murphy, may now be permitted, if section 201(c)(2) is glossed by relying on other statutes and past practice; but the latter should still be forbidden as outside the gloss or else the prosecutor could just pay witnesses money for their testimony. Murphy points to language supporting his distinction in two different cases, *United States v. Singleton (Singleton II),* 165 F.3d 1297, 1303–08 (10th Cir.1999) (en banc) (Luccro, J., concurring), and *United States v. Medina,* 41 F.Supp.2d 38, 42 (D.Mass. 1999).

After Murphy filed his brief in this court, another panel decided *United States v. Lara,* 181 F.3d 183, 197 (1st Cir.1999), whose "explicit and unqualified" holding is "that section 201(c)(2) does not apply at all to the federal sovereign qua prosecutor." That decision, which governs this panel, *Williams v. Ashland Eng'g Co., Inc.,* 45 F.3d 588, 592 (1st Cir.1995), *cert. denied,* 516 U.S. 807, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995), disposes of Murphy's narrower argument. We add that independent of section 201(c)(2), there are surely outer limits on what a prosecutor can do in offering benefits to a witness. But even without *Lara,* we would not be inclined to view leniency in state proceedings or forestalling deportation as markedly different in character or consequence than a lesser sentence or no prosecution at all in the case at hand.

 Murphy's final argument on the merits of his conviction is that the evidence in support of one of the counts—the charge of extorting money from Machore following the May 6 arrests—did not establish the necessary link to interstate commerce. This count, which involved ac-

tual extortion of money the Boston Police Department handed over to Murphy, required the government to prove that Murphy participated or assisted in extortion that "in any way or degree obstruct[ed], delay[ed], or affect[ed] [interstate] commerce or the movement of any article or commodity in [interstate] commerce...." 18 U.S.C. § 1951(a). The "commerce" requirement is the basis for Congress's power to criminalize the conduct under the Constitution. *See Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

Murphy argues that the government's commerce showing rested on the theory that the money diverted from the Boston Police Department to Murphy would otherwise have been available to the police to purchase articles in interstate commerce. Murphy agrees that it is enough that money is diverted from a pool of funds that is otherwise used (at least in part) to purchase goods that flow in interstate commerce. *United States v. DiGregorio,* 605 F.2d 1184, 1190–91 (1st Cir.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979). But he says that in this case the drug proceeds seized in the taxi search would, if retained by the police, have been available under state law only for limited purposes and not for general "operating needs." Mass. Gen. Laws ch. 94C, § 47(d).

At trial, the government offered evidence that in the year the extortion occurred, the Boston Police Department made substantial purchases of goods and services in interstate commerce. In response to Murphy's argument, the government says that state law on its face generously permits use of forfeited drug funds for "protracted investigations, to provide additional technical equipment or expertise ... or to accomplish such other law enforcement purposes" as the police deem fit. *Id.* Given the breadth of this statutory language and the proof that the police did buy goods and services interstate, we agree that a rational jury could find the

minimal effect needed for the jurisdictional showing. *United States v. Olbres,* 61 F.3d 967, 970 (1st Cir.1995).

Apparently there was no specific evidence that the restricted funds were in fact used for interstate purchases (even though they could have been so used). But even assuming that this was beyond the jury's power to infer—a point we need not decide—the diversion of forfeited funds could hardly help but constrain the availability of operating funds at least in some minimal degree; and little is needed to satisfy the very low jurisdictional threshold. *DiGregorio,* 605 F.2d at 1190–92. We therefore need not consider the government's other and quite independent theories of how the extortion scheme affected commerce, offered as alternative grounds for upholding the verdict.

*Affirmed.*