UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony O. KELLY, Peter Kanelopoulos,
Dana Cheney and James H. Orrell,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Peter J. WEYLAND,
Defendant-Appellant.

Nos. 80–3745, 80–3789.

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1982.

Certiorari Denied Nov. 1, 1982.
See 103 S.Ct. 305.

Michael S. Fawer, New Orleans, La., Paul L. Perito, Washington, D. C., for Weyland.

Marvin D. Miller, Alexandria, Va., for Kanelopoulos.

Larry G. Turner, Gainesville, Fla., for Orrell.

J. Flowers Mark, William B. Moffitt, Alexandria, Va., for Cheney.

John Di Giulio, Baton Rouge, La., for Kelly.

C. Michael Hill, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

COLEMAN, Circuit Judge.

The *known* actors in this one ton marijuana case were Peter J. Weyland, James Orrell, Dana Cheney, and Anthony O. Kelly. Another individual who was convicted on circumstantial evidence of being a participant in the episode is Peter Kanelopoulos. All five have appealed their convictions and sentences for violations of the Controlled Substances Act of 1970, 21 U.S.C., Sections 841(a)(1) and 846. We affirm the convictions of all defendants on all counts.

## Facts

On May 10, 1979, Drug Enforcement Administration special agent Kenneth C. Feldman received a phone call from Benson Swift. Swift had acted as an informant for the DEA and had supplied information regarding the activities of Peter J. Weyland. During the phone call, Informant Swift told Agent Feldman of a proposed trip from Washington, D. C. to the southern part of the United States to purchase a large quantity of marijuana *for Weyland.*

The next day, May 11, 1979, Feldman, in his undercover capacity, met Swift and James Orrell at the Roy Rogers Restaurant in Springfield, Virginia. Orrell told Feldman and Swift that a Winnebago camper and a pickup truck were to be driven to Baton Rouge to pick up a "load".

Soon thereafter, the three men departed on the projected journey—Agent Feldman and Informer Swift in a Ford pickup truck and Orrell in the Winnebago mobile home, the two vehicles being followed by undercover DEA agents William Williams and Wallace Morgan in an automobile. These agents kept in contact with Feldman via a two-way radio.

For the seventeen hour trip to Baton Rouge, Orrell remained in the Winnebago the entire time. Swift and Feldman alternated between the pickup truck and the Winnebago. Driving was done in rotation and the vehicles stopped only for food, for gasoline, or for Orrell to use the telephone.

Orrell telephoned and talked with Weyland six times during the trip to Baton Rouge.

Weyland purchased the 1975 Winnebago in August, 1978, and the vehicle was registered in his name at the time it was seized by the DEA agents. Weyland bought the Winnebago through Orrell, an employee of Weyland's sole proprietorship, Eager Beaver Auto Services of Alexandria, Virginia. Before buying the Winnebago, Weyland authorized and directed substantial modifications of the camper, which included installation of a private storage compartment secured by a locked door and modification of the rear suspension to increase the Winnebago's load bearing capacity.

On the afternoon of May 11, at a lunch stop in Knoxville, Tennessee, Orrell pointed out to Agent Feldman the raised rear end of the Winnebago and told him that the special suspension would allow the camper to sit normally when the expected load of *four thousand pounds* of marijuana was placed in it. Late that evening at a stop outside Jackson, Mississippi, after making a phone call, Orrell told Feldman that the marijuana was of extremely high quality and that Weyland was paying a very high price for it.

After these conversations with Orrell, Agent Feldman believed that money was on the Winnebago. While Orrell was driving, Feldman left the passenger seat and went to the bathroom in the rear of the Winnebago. In the bathroom, Feldman opened a closet and found a briefcase. When he opened the briefcase, there were fourteen stacks of twenties, fifties, and hundreds which he initialled, along with the date, on the top and bottom bills. Although he did not count the money, he estimated it to be around a hundred thousand dollars. After replacing the briefcase, Feldman returned to his seat.

The two vehicles, followed by the surveilling DEA agents, reached Baton Rouge, Louisiana, at approximately 6:00 A.M. on the morning of May 12. Charles Bremer, a DEA agent assigned in Baton Rouge, saw the Winnebago at approximately 6:10 A.M.,

as it crossed Sherwood Forest Boulevard on Interstate 12, traveling west. He began mobile surveillance behind the two vehicles and followed them to the Ramada Inn on Airline. He thereafter watched the Winnebago at the Ramada Inn.

Orrell, Swift, and Feldman went into the motel lobby. Feldman and Swift checked into room 123 and Orrell into room 125. Feldman looked over Orrell's shoulder and saw Orrell sign a false name to the register. Shortly after the men had gone to their rooms, Feldman left under the pretense of looking for gas and drove the Winnebago across the street to a service station which was closed. Adjacent to the station was the Days' Inn Motel where Feldman talked with DEA agent Williams. This agent did not enter the Winnebago. Feldman returned to the Ramada Inn at approximately 8:15 A.M.

Upon returning to the Ramada Inn, Feldman observed a man later identified by him as the defendant, Dana Cheney, enter Orrell's room, number 125. *Orrell told Feldman not to come into the room since the persons inside did not want to be seen.* Feldman went to the hotel coffee shop. After leaving the coffee shop and upon approaching Orrell's room, Feldman observed a person, later identified as Peter Kanelopoulos, enter Orrell's room.

Around 8:20 A.M., and after Kanelopoulos had entered the room, Orrell told Feldman that there would be only two thousand pounds of marijuana, rather than four thousand, therefore the pickup truck with the camper on the back would not be needed. Orrell told Feldman and Swift that they would receive $1,000 for making the trip. Orrell gave Swift $200 for expenses on the return trip. Orrell also told them that he was going to leave in approximately twenty-five minutes and that it would take five minutes to reach the place where the marijuana was and twenty minutes to load the Winnebago. He would take the short route back to the Washington, D. C. area and would meet them on the highway so as to make the return trip together. Feldman suggested that once Orrell had loaded the Winnebago that Orrell call them at the motel. After Orrell left, Feldman called Agents Williams and Redford to notify them of the change of plans.

The Winnebago left the Ramada Inn at approximately 8:24 A.M. and was in a gasoline station until 8:51 A.M. At approximately 9:00 A.M. the Winnebago stopped next to another vehicle on Hooshootoo Road. The other vehicle, a red and white car, contained two white males but Special Agent Charles Bremer could not identify either its make or its license plate. The driver of the red and white car got out of his vehicle and spoke through the driver's window of the Winnebago to Orrell before returning to his car and leaving the scene. The Winnebago remained at the location for approximately thirty minutes, until the red and white car returned. Then both vehicles left and drove to a commercial location, which Bremer testified he believed to be a bank. The driver of the red and white car was observed to leave that vehicle and get in the Winnebago. The Winnebago was followed directly to 4445 Arnold Lane, in Baton Rouge, arriving there at approximately 9:45 A.M.

The Winnebago stayed at the Arnold Lane address for approximately twelve minutes. Agents were watching the Arnold Lane address from a distance but they had an obstructed view because of the nature of the location and the trees surrounding the premises. However, the agents saw several individuals moving near the Winnebago. After it left the residence, the Winnebago went to a service station where Orrell called Feldman to tell him that the marijuana had been loaded and the Winnebago was on its way to Washington, D. C.

After receiving Orrell's phone call, Feldman and Swift stopped at the Days' Inn Motel, across the highway from the Ramada Inn, to advise the DEA agents of what was happening. Feldman and Swift then left in the pickup truck in an attempt to try to catch the Winnebago and make an undercover arrest. While the Winnebago was traveling down the Interstate, it was under surveillance by both air and ground vehi-

cles. During this same period of time, the house on Arnold Lane was left without official observation.

In an effort to get Orrell to stop, Feldman contacted the Winnebago by CB radio and told Orrell that the pickup was having overheating problems. Orrell told Feldman that the Winnebago would not stop for any reason. After a little more than an hour, Feldman caught up with the Winnebago, passed it, and stopped on the side of the highway. Feldman's breakdown ruse did not get the Winnebago to stop. As it passed, Feldman noticed that the Winnebago was now level. Then Feldman contacted other agents to stop the Winnebago. It was approximately seventy-five miles from Baton Rouge when it was stopped at 11:18 A.M.

Once the Winnebago was stopped, Orrell and Cheney were searched, handcuffed, and placed face up on the ground. Agents Redford and Howard searched inside the Winnebago. When Redford reached the locked door leading to the compartment containing two beds he asked for the key but Cheney and Orrell made no response. He then ordered that the door be opened with a tire iron. Once the door was opened, Redford saw large green plastic bags and cardboard around some, but not all, of the bags. The bags were completely sealed. Redford took his pocket knife and cut into one of the bags. Upon discovering marijuana, Redford told Agent Bremer to place Orrell and Cheney under arrest and read them their *Miranda* rights. The Winnebago was taken to the State Police Troop Headquarters at Covington, Louisiana.

Upon discovery of the marijuana at Covington, surveillance was resumed on the Arnold Lane residence at 1:00 P.M. A car left the residence at 3:00 P.M., whereupon Louisiana State Trooper Crittenden was instructed by Trooper White to obtain identification of the driver and passenger. Crittenden used the fact that the car had no inspection sticker to pull it over and ask for identification. Anthony Kelly and his wife, owners of the Arnold Lane residence, were in the car and explained why there was no inspection sticker. Crittenden did not give them a citation and they were allowed to go on their way. About thirty minutes after Kelly was stopped, the residence was secured. In securing the premises, the officers went into the house to check throughout the house, including closets, for people who might be hiding in the house. The door which Trooper Crittenden went through to enter the house was open and Trooper White announced that they were the police. While securing the house, they entered a storeroom where there were several bales of marijuana. Crittenden testified that there was green vegetable matter showing through an opening in one of the bales which were in green plastic bags. At that time, Crittenden closed the door and the officers waited for the search warrant.

During the time that the house was secured, two men came to the residence. They were watched, but not detained. In addition, Kelly's attorney came to the house. She entered and was watched by the officers. The search warrant arrived around 7:30 P.M. and Kelly, who had returned home, was arrested. In addition to the marijuana found at Arnold Lane, there was also an ashtray containing particles of cocaine.

As to Peter Kanelopoulos, his name was on a car rental contract signed by someone on the day of the seizure. However, Kanelopoulos' signature was not verified by a handwriting expert. The license plate number of the automobile as it appeared in the rental contract was seen by a trooper on a red and white Dodge Magnum automobile several days after the Winnebago was seized. Later, on the same day of the seizure and arrests, Kanelopoulos was seen getting off a flight in Washington, D. C. which had originated in Baton Rouge, Louisiana, with a stopover in Atlanta, Georgia. A check of the computerized list of passengers did not reveal the name of Kanelopoulos, leading to the obvious inference that he had flown under an assumed name and had left the Baton Rouge area soon after he had been seen there.

*The Search of the Winnebago*

This case was orally argued in New Orleans on November 2, 1981. This Court was aware that the Supreme Court had granted *certiorari* in *United States v. Ross*, —— U.S. ——, 102 S.Ct. 386, 70 L.Ed.2d 205 (1981). Since the search of the Winnebago herein described, and the evidence obtained by that search, furnished the crucial point of attack for the appeals, we directed the Clerk to notify counsel that we would delay decision pending the guidance expected to result from the disposition of *Ross*. On June 1, 1982, *Ross* was decided, —— U.S. ——, 102 S.Ct. 2157, 73 L.Ed.2d 572.

We need not restate *Ross*. Suffice it to say, under the principles there set forth the search of the Winnebago and the ensuing discovery of the marijuana did not violate the Fourth Amendment. It necessarily follows that proof of guilt as to Weyland, Orrell, and Cheney was overwhelming. Their convictions are affirmed forthwith.

*The Case as to Kelly's House 4445 Arnold Lane*

From the facts recited in the beginning of this opinion, the only place where the marijuana could have been loaded onto the Winnebago was at the Kelly house, 4445 Arnold Lane. Until it was actually done the government agents did not know in advance where the loading would take place. They saw the Winnebago leaving 4445 Arnold Lane at 9:57 A.M. That the Winnebago had the marijuana aboard was not established of their own personal knowledge until the vehicle was stopped near Covington at about 1:00 P.M. Between 9:57 and 1:00 o'clock no watch was maintained at the Arnold Lane residence. The agents had seen that there were three men in the Winnebago when it went to Arnold Lane and only two in it when it was stopped in the act of transporting a ton of marijuana.

At 1:30 P.M. an agent of the Drug Enforcement Administration met with the Assistant United States Attorney to prepare applications for a search warrant for the Arnold Lane house. This effort continued until about 5:30 P.M. The magistrate did not issue a search warrant until around 7:45 or 8:00 o'clock.

In the meantime, about one o'clock the Louisiana state trooper who had been piloting the helicopter surveilling the Winnebago between Baton Rouge and Covington returned to a place within sight of the Arnold Lane residence. At approximately 3:00 o'clock a man, a woman, and a child left the Arnold Lane residence in an automobile. Trooper Crittenden stopped the automobile and obtained Kelly's identification. The woman was Kelly's wife, and the child was theirs. While Crittenden thus obtained Kelly's identification and learned whose house was involved, this also alerted Kelly that he was under suspicion and that some kind of investigation was under way. Therefore, at about 5:30 o'clock, with the approval of the Assistant United States Attorney, a state officer was directed to secure the premises at 4445 Arnold Lane but was told not to search the residence because a search warrant was then in the process of being obtained. The state officers then entered the residence and found no one present. While the state troopers went from place to place in and outside the house checking for the possible presence of individuals who might be there, and armed, 125 pounds of marijuana was seen but not seized. The officers left it where it was until the search warrant came. During this time Kelly's attorney came to the house. When the warrant was received the 125 pounds of marijuana was seized and Kelly was arrested.

Kelly now complains that the marijuana should have been suppressed as being the object of an invalid search. He admits probable cause for a search but argues that no evidence of exigent circumstances justified entry into the house and its appendages pending the receipt of the search warrant.

We cannot agree with these contentions. This is not a case in which officers insensitive to the commands of the Fourth Amendment entered the house at their conve-

nience and for their purposes to see what could be found. On the contrary, when the officers found out that Kelly's residence was the situs for the delivery of a ton of marijuana they immediately began, on a Saturday when federal offices are ordinarily closed, to obtain a search warrant. For over two hours the state trooper remained at a distance from the house, awaiting the arrival of the warrant. It turned out that it took a terribly long time to get a warrant on a Saturday, but the officers stood by until they stopped Kelly, found out he was the householder, and thus alerted him to what was going on. The officers were then instructed to move into the house, to see that no evidence was destroyed, and not to search it. While checking for individuals who might have been in and around the house, the marijuana was seen in plain view in a storage room, but not seized. When the warrant finally arrived, the contraband was seized.

■ Taking the facts of this case by their four corners, looking at everything which was known to the law enforcement officers before and after the Winnebago arrived in Baton Rouge, together with what they certainly knew after it was stopped, it seems to us that exigent circumstances did exist. Had the $100,000 in contraband money, subject to confiscation, been left in the house? Had all the marijuana been loaded on the Winnebago? Left unsecured, any occupants in the house could easily have done away with portions, or maybe all, of the evidence. What it all comes down to is that we believe the officers, in good faith, did all they could do to obtain the required warrant. For reasons beyond their control they were a long time getting it on a Saturday. They scrupulously refrained from seizing the marijuana until the warrant was actually in hand.

■ It is certainly true that warrantless entries into a person's home are per se unreasonable but they may be justified where sufficient exigent circumstances exist. See, e.g., Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct.

1969, 26 L.Ed.2d 409 (1970). The possibility that evidence will be destroyed has often been recognized as sufficient exigency to justify warrantless entry, even a search, without waiting on a warrant, see, e.g., United States v. Edwards, 602 F.2d 458, 468 (1st Cir., 1979). Edwards cited cases which included our own decision in United States v. Gardner, 553 F.2d 946 (5th Cir., 1977), on which the Supreme Court denied certiorari, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753.

We hold that Kelly's Fourth Amendment rights were scrupulously observed as far as the facts, the mechanics, and the exigencies of the situation allowed. Under the appropriate Fourth Amendment standards, the entry of the house was reasonable. The seizure, of course, was supported by the warrant.

Kelly's conviction is affirmed.

### Mr. Kanelopoulos

■ As to this defendant the government had to prove to a reasonable jury beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that he was, in fact, guilty, United States v. Doe, 664 F.2d 546 (5th Cir., 1981). Moreover, mere presence is not enough, United States v. Scott, 678 F.2d 606 (5th Cir., 1982).

We conclude, however, that within these standards a reasonably minded jury [in this instance, the court sitting without a jury] could have returned a guilty verdict, as it did.

■ The occupants of Orrell's room did not wish to be seen by others. Nevertheless, Kanelopoulos was readily admitted, not long before the marijuana was loaded at Kelly's. Orrell obviously knew how and where to get in touch with Kanelopoulos, very quickly after he arrived in Baton Rouge. Orrell had signed the motel register with a false name. Kanelopoulos could not have learned of this room number without either communication with someone who knew it or knowledge of the false name used in registering. In any event, soon after Kanelopoulos put in his appear-

ance, Orrell told Feldman that only a ton of marijuana would be transported, not the two tons as previously planned, and that the pickup truck would not be needed for transportation purposes. The jury might take into account the possibility that Orrell learned of this change of cargo from either Cheney or Kanelopoulos. A red and white automobile had twice met with the Winnebago by the roadside. A car of the same color had been rented on a contract carrying Kanelopoulos' name. It had been returned to the rental agency at 12:47 P.M., eighteen minutes before the defendant enplaned in Baton Rouge for Washington, traveling under an assumed name. The flight stopped only in Atlanta and Kanelopoulos was seen leaving the flight in Washington at 5:20 P.M., Baton Rouge time. These activities, some surreptitious to a degree and others totally surreptitious, executed directly with the marijuana runners, carry no earmarks of innocence. To the contrary, a reasonable trier of the fact, looking also to the inferences reasonably to be drawn from the facts, would be justified in believing that Kanelopoulos was up to his ears in this marijuana transaction. Indeed, he was on the ground before Orrell got there and no marijuana was acquired until Kanelopoulos conferred with Orrell and Cheney in the motel room from which the others were excluded. Then, when the stuff had been loaded on the Winnebago, Kanelopoulos speedily got out of town, returning to the Washington base of operations. This all points toward guilt and not toward innocence. No one link in this chain of circumstantial evidence was proof of Kanelopoulos' guilt. However, in considering whether his complicity was established beyond reasonable doubt the jury was entitled to take into account each of these facts, and to evaluate them in the light of the great improbability that all of them, taken together, would point in the wrong direction.

Kanelopoulos says, however, that this is insufficient to prove that he *possessed* the marijuana with intent to distribute it, the offense for which he was convicted. We disagree. From this record, the trial judge could infer beyond a reasonable doubt, as he

did, that Orrell never had any marijuana in his possession until after he had met with Kanelopoulos and made his arrangements to acquire it at the Kelly house. Therefore, this defendant was at least in constructive possession of the contraband and was a vital cog in its distribution. The proof was not insufficient.

The judgment of the District Court is, as to all defendants,

AFFIRMED.