UNITED STATES of America, Appellee,

v.

Ralph Joseph PALUMBO, Defendant,
Appellant.

No. 82–1102.

United States Court of Appeals,
First Circuit.

Argued Sept. 14, 1983.

Decided March 22, 1984.

Opinion on Rehearing
Sept. 14, 1984.

Skelton, Senior Circuit Judge, sitting
by designation, concurred with opinion.

Bownes, Circuit Judge, dissented with
opinion.

David Levy, Jamaica Plain, Mass., by appointment of the Court, with whom Taff, Levy & Presley, Jamaica Plain, Mass., was on brief, for defendant, appellant.

Helen J. Forsyth, Asst. U.S. Atty., Concord, N.H., with whom W. Stephen Thayer, III, U.S. Atty., Richard F. Johnston, Asst. U.S. Atty., Concord, N.H., was on brief, for appellee.

Before BOWNES, Circuit Judge, ALDRICH and SKELTON *, Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

■ In this proceeding Ralph J. Palumbo appeals his three-count conviction for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Although there was a warrantless police entry and occupancy of Palumbo's home subsequent to his arrest that violated the fourth amendment, it had no consequences, and we hold it did not taint items later discovered and seized as the result of independent probable cause and a valid warrant.

With the assistance of a police informer, a law enforcement team comprised of officers from the Maine State Police, the New Hampshire State Police, and the federal Drug Enforcement Administration (DEA), arranged to purchase ten ounces of cocaine from Palumbo's codefendant Robert Walker.[1] During telephone conversations between Walker and the informant, John Bradley, setting up the sale, Walker identified Palumbo as his source of supply. Walker agreed to consummate the deal on July 14, 1981, in Salem, New Hampshire. The law enforcement team commenced surveillance of Walker on July 14. Trooper Williamson of the New Hampshire State Police observed Walker's car leave the Palumbo residence and drive to the place designated for the sale, the Salem Inn. Bradley and DEA agent Gerald Graffam, who was working undercover as informant Bradley's driver, displayed $25,000 in a briefcase to Walker. Walker then stated that Palumbo did not want to travel to Salem and the sale would be completed in Dover, New Hampshire. Dover is about five miles from Palumbo's home in Berwick, Maine.

Later that day, at approximately 5:00 p.m., Walker and Bradley met in the lounge of the Ramada Inn in Dover. After a brief conversation, Walker left the Inn. Trooper Williamson, utilizing aerial surveillance, observed him drive to the Palumbo home and pick up Palumbo. Walker's automobile was shortly thereafter seen in the parking lot of the Ramada Inn. Informant Bradley entered the Walker car where Walker and Palumbo were sitting and a brown paper bag was passed to Bradley. After observing a white powder in the bag, Bradley gave the signal and Palumbo and Walker were arrested. At the moment of the arrest, informant Bradley was in the back seat with the package of white powder and the empty briefcase. A field test revealed the powder to be cocaine.

The arrests occurred at approximately 6:00 p.m. A short time later, it was decided to obtain a search warrant for the Palumbo home in Berwick, Maine. A search warrant was authorized at approximately 11:00 p.m. by a Maine state judge.

We pause here to address plaintiff's contention that there were intentional or reck-

---

* Of the Federal Circuit, sitting by designation.

1. Although defendants Palumbo and Walker were tried jointly, this appeal is pressed by Palumbo alone. Codefendant Walker's appeal, involving a variety of issues, has already been decided. *See United States v. Walker,* 1 Cir., 1983, 706 F.2d 28.

less misstatements in the affidavit for the warrant, which statements were necessary to the determination of probable cause. The court held a hearing under *Franks v. Delaware*, 1978, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667, and found that, in fact, certain intentional misstatements had been made. Nevertheless, it held that, even excluding these statements, the affidavit established probable cause. We agree.

■■■ Stripped to its essentials, and without the misstatements, the affidavit still established that (1) Walker stated Palumbo was his source for cocaine, (2) prior to the transaction, Walker stated that Palumbo had asked that the meeting place be changed from Salem to Dover, New Hampshire, a place nearer Palumbo's home, (3) Walker was observed travelling to Palumbo's home immediately prior to the transaction, and returning toward the Ramada Inn in Dover with Palumbo, and (4) Walker and Palumbo transferred cocaine to the government informant at the Dover Ramada Inn. Warrant affidavits are to be read in a common sense manner. *United States v. Ventresca*, 1965, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684. Here we have no trouble finding the magistrate had a "substantial basis" for concluding, *see Illinois v. Gates*, 1983, 462 U.S. 213, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527, that there was "reasonable cause to believe" there was evidence of Palumbo's cocaine dealing inside his home. *See Zurcher v. Stanford Daily*, 1978, 436 U.S. 547, 556–57, 98 S.Ct. 1970, 1976–77, 56 L.Ed.2d 525. The warrant was therefore valid, despite the misdirected effort of the police.

At the same time that the officers decided to obtain a search warrant, they also decided to "secure" the Palumbo home pending application for, and the authorization of, the warrant. Apparently this decision was communicated to Assistant District Attorney Libby, who approved it. The reason DEA agent Graffam gave at the suppression hearing for "securing" the Palumbo home prior to obtaining a warrant was that, prior to the transaction, a check of the DEA computer indicated that Donna Palumbo had been rumored to be in the drug trafficking business with her husband. Graffam felt that Palumbo would have been expected home by his wife shortly after the drug sale and, if he did not show up within a reasonable time, she would assume something had happened to him and destroy any drugs in the house. She might also learn of trouble directly, there being numerous witnesses at the Ramada Inn watching the arrest, and Palumbo being fairly well-known in the area.

The police had no affirmative evidence to back up these apprehensions, and we consider it a rather thin case of exigent circumstances, which should be anything but automatic. We do note, in passing, that defendant's complaint that the police were ignorant as to whether Mrs. Palumbo was at home is unjustified. As a result of knocking they knew she was home prior to entering, and there is no evidence that they planned a forceful entry if the house was vacant.

Sometime between 6:30 and 7:00 p.m., a contingent of police officers went to the Palumbo home. When Mrs. Palumbo opened the door, two officers showed their badges, entered the house without consent, and informed her they had probable cause to search the house and were awaiting the arrival of a search warrant. Three or more officers, also in plain clothes, then entered the Palumbo residence. Mrs. Palumbo demanded to see a warrant. After the officers said one was coming, Mrs. Palumbo ordered them out of her home, but they refused, telling her that they were "securing the premises" in anticipation of the arrival of the warrant. Mrs. Palumbo asked if she and her two teenage children could leave and she was told that her children could leave, but that she could not.

■■ The Court has noted that "imminent destruction, removal, or concealment of the [evidence] to be seized" may be one type of exigent circumstance which would justify warrantless entry into a dwelling. *United States v. Jeffers*, 1951, 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59; *Johnson v. Unit-*

*ed States*, 1948, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436. We have so held. *United States v. DiGregorio*, 1 Cir., 1979, 605 F.2d 1184, 1188, *cert.· denied*, 444 U.S. 937, 944, 983, 100 S.Ct. 287, 302, 489, 62 L.Ed.2d 197; *United States v. Edwards*, 1 Cir., 1979, 602 F.2d 458, 468. When such an exigency is found, however, the least restrictive intrusion is to be adopted, or the whole constitutional requirement for obtaining a warrant would be defeated. When it is known that no one is presently on the premises, they may be secured merely by guarding the entrances. *Cf. United States v. Agapito*, 2 Cir., 1980, 620 F.2d 324, 337 *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40; *United States v. Young*, 8 Cir., 1977, 553 F.2d 1132, 1134, *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278. When persons are present and such persons may reasonably be feared to pose a substantial threat to destroy evidence, more intrusive action may be proper. *Cf. United States v. Edwards*, ante, 602 F.2d at 461. Even then, the police might be well advised to give the occupants a choice of exiting the premises. *See United States v. DiGregorio*, ante, 605 F.2d at 1188 n. 3. This might be accompanied by "a very quick and limited pass through the premises to check for third persons who may destroy evidence." *United States v. Agapito*, ante, 620 F.2d at 335.

Even assuming the police here had sufficient grounds to enter and "secure," at least to a minor extent they acted excessively. Upon entry, they fanned out through the house, outside the sight of the Palumbo family in the kitchen—Mrs. Palumbo, Mr. Palumbo, Sr., and children. A brief look around might be justified to check whether other persons were present, *United States v. Agapito*, ante, but they went further, and, at the least, searched Mr. Palumbo Sr.'s carry bag upstairs. The court also found that one officer conducted a limited search of the kitchen hutch. While this last might be justified as a safety check, the upstairs searching was not excusable.

We pass over the rest of the evening. The Palumbos ultimately were allowed to leave after a search of what they elected to take with them. We need not address the propriety of these searches, except to note them presumably consistent with the goal of preserving evidence. Perhaps fortunately for the police, they failed to discover evidence in any of their searches, and nothing that they observed was contained in the application for the warrant. When, sometime nearing midnight, a new contingent of police arrived with a ·proper warrant, the house was dark, with the initial officers sitting outside. A new, and more thorough search was then instituted. No cocaine or other drugs were found, but guns, scales, weights, an empty can said to have contained cutting agents, a leatherette pouch containing glass vials, and a handscale and other items were seized. The question is whether, assuming the earlier police action was unlawful, the court erred in denying Palumbo's motion to suppress these articles.

■ The exclusionary rule is a well settled penalty designed to discourage improper police behavior by the practical expedient of preventing the use of what had been wrongfully obtained. From the standpoint of the guilty defendant even this, in a sense, is a windfall; there is no reason why the penalty should go beyond the offense. The Court has long held that not all evidence linked to an unlawful search is inadmissible. As early as *Silverthorne Lumber Co. v. United States*, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, the Court stated,

"If knowledge of [facts] is gained from an independent source, they may be · proved like any other, but the knowledge gained by the government's own wrong cannot be used by it."

This statement was paraphrased by J.M. Maguire, Evidence of Guilt, 221 (1959), quoted with approval in *Wong Sun v. United States*, 1963, 371 U.S. 471, at 488, 83 S.Ct. 407, at 417, 9 L.Ed.2d 441.

"Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to

which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

In other words, bad conduct condemns the consequences of bad conduct, but there is no reason for it to spill over and affect consequences, even if they were the same, of truly independent good conduct.

Invocation of the independent source rule may take various forms. The broadest is expressed by the term "inevitable discovery," a principle we recognized in *United States v. Bienvenue,* 1 Cir., 1980, 632 F.2d 910, 913–14. There the police wrongfully searched the defendant's residence and found check stubs and other materials which led them to a travel agency where incriminating evidence was found. Even though this evidence was discovered as a direct result of unlawful conduct, and would, for that reason, normally be suppressed, we declined to do so because of the court's finding that the police would have visited travel agencies anyway, because of information lawfully obtained. The initial, unlawful seizure of the travel agency items did not irretrievably taint them; they became usable upon proof that they would inevitably have been discovered by proper means.

In this we were following our earlier case of *McGarry's Inc. v. Rose,* 1 Cir., 1965, 344 F.2d 416, 418–19, *aff'g Lord v. Kelley,* D.Mass., 1963, 223 F.Supp. 684, where, at 691, Judge Wyzanski put it simply.

"The owner of the records is entitled to be as well off as if Flattery had not unlawfully seized those papers, but he is not entitled to be any better off."

*See also McGarry v. United States,* 1 Cir., 1967, 388 F.2d 862, 870–71, *cert. denied,* 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455.

The independent source rule is to be applied strictly. If the article is found initially as a result of the wrongful conduct, it is insufficient to show that it *could* have been found independently, it must be shown that it *would* have been. *United States v. Fi-*

*nucan,* 1 Cir., 1983, 708 F.2d 838, 843. The fact, however, that it remained in police custody at all times thereafter does not preclude removal of the taint by proof that the discovery would have been inevitable. *United States v. Edwards,* ante, 602 F.2d at 469 n. 12 (alternative holding); *United States v. Segura,* 2 Cir., 1981, 663 F.2d 411, 416, *cert. granted,* 459 U.S. 1200, 103 S.Ct. 1182, 75 L.Ed.2d 430; *United States v. Beck,* 8 Cir., 1981, 662 F.2d 527, 530; *see United States v. Allard,* 9 Cir., 1980, 634 F.2d 1182, 1184–85. Two courts, however, have recognized that this might present a special problem: the original probable cause would have led to the right spot, but, had it not been for the wrongful detention, the article might no longer have been there. In such event, the wrongful seizure would have contributed to the apprehension.

In *United States v. Allard,* ante, the court found that there was insufficient cause to justify a warrantless entry to secure. It recognized the government's right to prove inevitable discovery, and stated this right was not lost by continuous improper possession. It held, however, that the motion to suppress should have been granted because "the government [failed to] demonstrate that the seizure made no practical difference." "For instance, the government [did not] prove that under the circumstances the evidence would not have been moved" but for the government's act. 634 F.2d, ante, at 1187.

In *United States v. Segura,* ante, on the other hand, the court recognized this issue, but concluded, on the facts, that it was unlikely that the defendant would have disposed of the evidence, and so denied the motion. 663 F.2d, ante, at 416.

The *Allard* rule imposes a difficult, if not impossible burden on the government, in effect eviscerating the independent source rule. We would take a different approach. Either the occupants are going to dispose of the evidence, or they are not. If, on the court's view, the police had adequate grounds to fear disposition, their entry would have been justified. If they had

inadequate grounds, should it not follow, unless the defense sought to prove the contrary, that the probability was that the evidence was not going to be disposed of? Where all other elements of the independent source rule were established, we consider that the *Allard* court whipsawed the government.

There is, however, another aspect, illustrated by *Segura.* The police there restrained defendant a total of 19 hours awaiting the warrant, 18 of which were consumed by "administrative delays" prior to making application. Confining a defendant in, or excluding him from, his premises for so long a period, especially for mere administrative convenience, might seem a gross abuse. An erroneous entry to secure, at least if done in good faith, might well be forgiven by application of the independent source rule; all that defendant suffered in such case, and all the police did wrong, was a premature entry. On the other hand, the abuse of a grossly excessive detainer, indicating police indifference to a need for dispatch, is a different taint, and might well be penalized by denying the police a cure by independent source. *See generally* Note, Police Practices and the Threatened Destruction of Tangible Evidence, 84 Harv.L.Rev. 1465, 1478 (1971).

We need not decide this question, because we would not apply that principle here. The present case easily satisfies the independent source rule. The warrant was based entirely upon probable cause learned prior to the original entry, and defendant has not even claimed that the evidence, physical objects much more cumbersome than drugs, would have been somehow disposed of had there been no prior entry. Five hours does not seem an excessive amount of time to obtain the warrant under the circumstances. *Cf. United States v. DiGregorio,* ante (8 hours). It may also be wondered whether, where defendant was at all times under arrest elsewhere, and not in any sense affected by the delay, he had standing to complain of any overstaying. He, of course, had none to complain of the search of his father's bag.

In deciding *Segura,* where the granting of certiorari has already been followed by argument, the Court may well answer these and many other questions. In the meantime we hold that at least when an unjustified entry to secure is done in good faith, with a reasonable, although insufficient excuse, the independent source rule can be applied unless there is affirmative evidence warranting a finding that, but for the entry, the articles would have been moved or disposed of, or it appears that the entry was unreasonably prolonged, to defendant's disadvantage. There was at least enough excuse here to satisfy our test.

Affirmed.

SKELTON, Senior Circuit Judge, Sitting by Designation, concurring.

I concur in the result reached by Judge Aldrich in his opinion in this case, but I do not agree with his holding that the independent source rule is applicable under the facts before us. This rule was neither briefed nor argued. Furthermore, the district court made no finding on the evidence with reference to it. Under these circumstances it may be questionable whether we are authorized to consider it.

In the next place, I do not find any evidence in the record from an independent source that indicated that the items complained of in the motion to suppress were in the Palumbo house or that they might be found therein. The only evidence to this effect came from the officers who executed the affidavit for the search warrant showing probable cause for its issuance. These were the same officers who made the warrantless entry into the house. While the question may be debatable, in my opinion information obtained from law enforcement officers who apply for a warrant and then violate the fourth amendment by entering, seizing and searching a private residence before the warrant is issued is not independent source information contemplated by the independent source rule. In such case the officers are not independent third parties, but are participants in the warrantless

entry, search and seizure transaction, and information given by them under these circumstances does not have the independent characteristic required by the rule. Otherwise, all the officers would have to do to enter, search and seize a house would be to first apply for a warrant and then proceed to violate the fourth amendment by making a warrantless entry. They could then say that their illegal act was excused because they had furnished independent source information in applying for the warrant. I cannot believe that the rule was ever intended to authorize such unlawful conduct by the police.

I realize that there is a lot of confusion and uncertainty with regard to the law governing the independent source rule. There is certainly room for argument and differences of opinion as to its meaning and application. It is hoped that the Supreme Court will establish guidelines as to its use when it considers *United States v. Segura,* 663 F.2d 411 (2 Cir.1981), *cert. granted,* 459 U.S. 1200, 103 S.Ct. 1182, 75 L.Ed.2d 430, in which the Court has already heard argument.

As to the issue before us, I believe we are all agreed that the officers entered the Palumbo house and seized and partially searched it without a warrant, and that there were no exigent circumstances nor exceptions to the fourth amendment that justified their actions. These acts by the officers were clearly a violation of the fourth amendment. However, on their initial entry and search, they did not find anything that was offered or introduced into evidence at Palumbo's trial. After they had made the preliminary search, they left the house and waited outside until the search warrant arrived, whereupon they made a complete search of the house and premises and found the items that were listed in the motion to suppress. The question before us is whether the original illegal entry, search and seizure of the house spilled over and tainted the later search under the search warrant, as well as the items found in that search. In my opinion, this did not occur. The later search was made in accordance with and under a valid

search warrant. Accordingly, the evidence discovered in that search was legal and admissible evidence that was properly introduced into evidence at the trial. *See United States v. Agapito,* 620 F.2d 324 (2 Cir.1980), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), where officers seized a suitcase without a warrant but did not open it until a warrant was obtained, whereupon it was opened and searched. A kilogram of cocaine found inside was held to be admissible evidence. Also *see United States v. Christophe,* 470 F.2d 865 (2 Cir.1972) *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973), which is much like our case. There the defendant was arrested and later the officers entered his house without a warrant and secured it by walking through it. Three hours later a valid warrant was obtained and thereafter a full scale search of the house was made and a quantity of heroin was discovered. The heroin was held to be admissible evidence. The court also held that the officers "were entitled to conduct a cursory examination of the premises to see if anyone else was present who might threaten their safety or destroy evidence."

Accordingly, I would hold that although there was a warrantless police entry and occupancy of Palumbo's house subsequent to his arrest that violated the fourth amendment, it had no consequences and did not taint items later discovered and seized under a valid search warrant, and that the district court correctly denied the motion to suppress the items. I join Judge Aldrich in affirming the judgment of the district court.

BOWNES, Circuit Judge (dissenting).

I differ with my brothers in three basic respects: one, I think the facts compel a finding that a warrantless entry and seizure of the Palumbo residence took place long before the warrant arrived; two, that there were no exigent circumstances justifying the entry and seizure; and, three, that the independent discovery rule does not apply.

I start my exposition of the facts with the arrival of the police at the Palumbo home after Ralph Palumbo was already in custody. Sometime between 6:30 and 7:00 p.m., at least five police officers went to the Palumbo home. Mrs. Palumbo was seated at her kitchen table drinking coffee with her father-in-law, Ralph Palumbo, Sr., who was visiting the family from out-of-state, when she observed two men approach the door. When Mrs. Palumbo opened the door, the two officers showed their badges, entered the house without consent, and informed her they had probable cause to search the house and were awaiting the arrival of a search warrant. Three or more officers, also in plain clothes, then entered the Palumbo residence. Mrs. Palumbo demanded to see a warrant. After the officers said one was coming, Mrs. Palumbo ordered them out of her home. To that demand the officers responded, "We're not going anywhere." The officers then informed Mrs. Palumbo that they were "securing the premises" in anticipation of the arrival of the warrant. Mrs. Palumbo asked if she and her two teenage children could leave and she was told that her children could leave but that she could not. I note, here, that if Mrs. Palumbo had been allowed to leave with her children the house could have been kept under surveillance from the outside with no danger of any evidence in the house being destroyed.

The police officers fanned out to various parts of the house, outside the field of vision of Mrs. Palumbo and Mr. Palumbo, Sr. Two preliminary, warrantless searches were then conducted. One officer searched the kitchen hutch and another officer searched Mr. Palumbo, Sr.'s suitcase which was upstairs.

Mrs. Palumbo again ordered the officers out of her house. They did not leave. It is not clear when the officers changed their minds about not allowing Mrs. Palumbo to leave the premises but she was told by the officers at some point that the occupants of the house could leave if they consented to a search of items taken with them.

Sometime after 7:00 p.m., Mrs. Palumbo telephoned a friend, Carol Melchionna, and asked her to drive over and take her children for the evening. As Mrs. Palumbo went down into the basement where the children were watching television, an officer followed her. She also went into the garage, accompanied by an officer, to get the dog. The officers had told her that if the dog attempted to bite one of them they would shoot it. Mrs. Palumbo then tied the dog to a tree away from the house.

By the time Mrs. Melchionna arrived, Mrs. Palumbo had been given permission by the police to leave. She started towards her car but was told that she could not use it. The police locked the car and took the keys. She was told that if she touched the officer giving directions she would be arrested for assault. She then got into Mrs. Melchionna's car and asked that the doors be locked. Her children were already in the car. At that point the officers blocked Mrs. Melchionna's exit with a police cruiser and banged on the windows directing Mrs. Palumbo to get out, warning her that she could not leave until her pocketbook was searched. By this time, the children were crying and nearly hysterical. Mrs. Palumbo therefore got out of the car. Mrs. Melchionna drove off with the children while Mrs. Palumbo's pocketbook was searched. Nothing was seized from it, and Mrs. Palumbo was permitted to leave. She walked into town where she telephoned Mrs. Melchionna to take her to join her children. Mrs. Palumbo's departure marked the last family member's presence on the Palumbo premises until after 11:00 p.m.

When Mrs. Palumbo left her residence, no lights were on. Conflicting testimony was presented regarding the presence of law enforcement officers in the Palumbo residence at the time she departed. When Mrs. Palumbo returned at 11:00 or 11:30 p.m., the outside, garage, and kitchen lights were on. The dog was sitting inside the garage. The officers were outside the house, sitting in the breezeway, between the garage and main house.

One officer testified that the law enforcement personnel vacated the house when Mrs. Palumbo left, but that the phone in the garage was used in her absence. Another trooper testified that he used the kitchen telephone to talk to Assistant District Attorney Libby, although the time of this call was not given.

An associate of the law firm retained by the Palumbos testified that when he arrived at the Palumbo residence shortly after 11:00 p.m., a partner of the firm was in the house with several law enforcement officers. The officers were requested to vacate the house, and they did so. When Mrs. Palumbo returned she was forbidden to reenter her home until the search had begun. At approximately 11:45 p.m., Corporal Holmes arrived with the warrant. At least fifteen law enforcement officers and seven police vehicles were present at that time. No copy of the warrant had been made, and the attorneys were allowed to read it only while the police held it. The attorneys were unable to scan the affidavit, however, because it had been sealed at the request of Corporal Holmes. The lawyers stated Mrs. Palumbo did not consent to the search and Holmes noted the objection. After the search began, the attorneys and Mrs. Palumbo were permitted to enter the house but were confined to the kitchen.

These facts, in my opinion, establish that starting at approximately 7:00 p.m. the police took complete control and possession of the Palumbo premises. The officers refused to leave the home when asked to do so by Mrs. Palumbo. The police decided who could leave the premises and when. They refused to allow Mrs. Palumbo to leave in her car, locking it and taking the keys. After Mrs. Palumbo left, the officers used the telephone freely and some of them remained inside the home. The dominion exercised over the Palumbo home from 7:00 p.m. until the warrant arrived at 11:45 p.m. constituted a seizure of the house, its contents, and Mrs. Palumbo's automobile. *United States v. Berkowitz*, 429 F.2d 921, 924 (1st Cir.1970).

It is a fundamental, repeatedly enunciated "principle of Fourth Amendment law," *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), that warrantless searches and seizures are *per se* unreasonable, *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted), unless they fall within one of the "few specifically established and well-delineated exceptions," *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978), to the warrant requirement. In the absence of consent or exigent circumstances, a warrant is required to authorize a police entry into a home. *Steagald v. United States*, 451 U.S. 204, 211–12, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981); *Payton v. New York*, 445 U.S. at 586, 100 S.Ct. at 1380; *United States v. Edwards*, 602 F.2d 458, 468 (1st Cir.1979); *United States v. Picariello*, 568 F.2d 222, 225 (1st Cir.1978).

That officers have probable cause alone, without indicia of exigent circumstances, does not authorize a warrantless entry of a residence, *Taylor v. United States*, 286 U.S. 1, 5–6, 52 S.Ct. 466, 467, 76 L.Ed. 951 (1932); *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925), nor after an illegal entry may valid searches or seizures occur absent a warrant. *Jones v. United States*, 357 U.S. 493, 497–98, 78 S.Ct. 1253, 1256–57, 2 L.Ed.2d 1514 (1958). Searches or seizures "conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' *Agnello v. United States*, 269 U.S. 20, 33 [46 S.Ct. 4, 6, 70 L.Ed. 145], for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer ... be interposed between the citizen and the police....' *Wong Sun v. United States*, 371 U.S. 471, 481–482 [83 S.Ct. 407, 413–414, 9 L.Ed.2d 441]." *Katz v. United States*, 389 U.S. at 357, 88 S.Ct. at 514. "Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951), and that searches and sei-

zures "conducted outside the judicial process, without *prior* approval by a judge or magistrate," *Katz*, 389 U.S. at 357, 88 S.Ct. at 514 (emphasis added), must fall within one of the recognized exceptions. "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking [an] exemption [from the requirement] to show the need for it." *Chimel v. California*, 395 U.S. 752, 759, 762, 89 S.Ct. 2034, 2037, 2040, 23 L.Ed.2d 685 (1969) (citations omitted).

On the authority of *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), I conclude that the police entry and occupancy of the Palumbo home constituted a search and seizure encompassed by the fourth amendment. In *Johnson*, the officers suspected the presence of illicit drugs in a hotel room but were unaware of the occupant's identity. They knocked, the door was opened, and they entered the room. The Court held that the entry marked the beginning of an illegal search. "An officer gaining access to private living quarters under color of his office must *then* have some valid basis in law for the intrusion." *Id.* at 17, 68 S.Ct. at 370 (emphasis added). This principle was reconfirmed recently in *Payton v. New York*, 445 U.S. at 590, 100 S.Ct. at 1382, and in *Steagald v. United States*, 451 U.S. at 212, 101 S.Ct. at 1647, when the Court observed, "[I]n terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to a house. Absent exigent circumstances, the threshold may not be crossed without a warrant." Accordingly, the police entry and seizure of the Palumbo home must find its justification in either consent or exigent circumstances.

Since there was no consent, the question is whether exigent circumstances, specifically the portent of destruction of evidence, justified the warrantless entry of the Palumbo home. The Supreme Court has recognized that "imminent destruction, removal, or concealment of the evidence to be seized" is one type of exigent circumstances which would justify a warrantless police entry and search. *United States v. Jeffers*, 342 U.S. at 52, 72 S.Ct. at 95; *see also Johnson v. United States*, 333 U.S. at 15, 68 S.Ct. at 369.

In *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the Court rejected a ruling by the Louisiana Supreme Court that a warrantless search was independently supportable because it involved narcotics which are easily removed, hidden or destroyed. The Court then went on to specify the situations justifying a warrantless entry into a home: consent; an emergency; hot pursuit of a fleeing felon; goods either in the process of destruction or about to be removed from the jurisdiction. *Id.* at 35, 90 S.Ct. at 1972. This is a stringent test and, if applied literally, no entry could be made unless the police possessed actual knowledge that evidence was being destroyed. As far as I know, no circuit court has followed this test literally.[1] While the police need not wait until the process of destruction is in progress or perfectly gauge the moment the destruction will begin, the belief that evidence is likely to be destroyed must be based on more than a mere supposition or one of a range of hypothetical possibilities. This circuit has never had occasion to decide what factors are necessary to underpin a finding that this type of exigency existed.

The Second Circuit, however, in at least two recent cases has faced this precise question. It has formulated and applied a

---

1. *See e.g., United States v. Edwards*, 602 F.2d 458, 469 (1st Cir.1979); *United States v. Agapito*, 620 F.2d 324, 335–36 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.1973), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *United States v. Kelly*, 683 F.2d 871, 876 (5th Cir.) *cert. denied*, 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982);

*United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); *United States v. Kunkler*, 679 F.2d 187, 191–92 (9th Cir.1982); *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir. 1983); *United States v. McEachin*, 670 F.2d 1139, 1144–45 (D.C.Cir.1981). *See also* 2 W. LaFave, Search and Seizure § 6.5 at 436–39 (1978).

test which strikes an appropriate balance between the competing public interests at stake, namely, the right of individuals to be secure in their homes and the interest of the public in preventing the disappearance of evidence necessary to convict criminal offenders. In *Segura v. United States,* 663 F.2d 411 (2d Cir.1981), the court reapplied the test it first formulated in *United States v. Agapito,* 620 F.2d 324 (2d Cir. 1980), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). In order for officers to enter a residence to prevent the destruction of evidence "the arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." *Segura v. United States,* 663 F.2d at 414 (quoting *Agapito* ).

A review of the facts leading to the decision to "secure" the Palumbo home prior to obtaining a warrant shows that the officers lacked the basis for a reasonable belief that Mrs. Palumbo was at the home and that she was aware of her husband's arrest so that the destruction of evidence was imminent. The testimony of Trooper Holmes was unequivocal: at the time it was decided to secure the home, the police did not know that Mrs. Palumbo was there, nor was there any reason to believe that she knew her husband had been arrested. The record discloses no attempt whatsoever to ascertain the presence of Mrs. Palumbo or others by surveillance or the use of other legitimate police investigatory methods prior to deciding to enter the home. There certainly was no shortage of available police personnel. At the least, a telephone call could have been made to determine if anyone was home. The officers simply assumed, without more, that Mrs. Palumbo was at home.

Nor does Agent Graffam's scenario that Mrs. Palumbo would learn either intuitively or from some third party that her husband had been arrested withstand scrutiny. The arrests of Palumbo and Walker occurred five miles from the Palumbo residence in the rear parking lot of a Ramada Inn in a city of over 20,000. Although there were several witnesses to the arrest, there was no reason for the officers to believe that any of the witnesses knew either Palumbo or his wife and would inform Mrs. Palumbo that her husband had been arrested.[2]

In summary, the officers had no objective independent facts on which to base their belief that Mrs. Palumbo was at home and would destroy any evidence in the house. The "reasonable belief" test had not been met, nor, of course, did the facts meet the more stringent requirements of *Vale v. Louisiana,* 399 U.S. at 34, 90 S.Ct. at 1971.

Additionally, it must be noted that, although DEA Agent Graffam testified he knew that telephonic warrants could be obtained under the Federal Rules, *see* Fed. R.Crim.P. 41(c)(2), no consideration was given to obtaining such a warrant. This was precisely the type of situation for which a warrant obtained by telephone was designed:

> Federal law enforcement officers are not infrequently confronted with situations in which the circumstances are not sufficiently "exigent" to justify the serious step of conducting a warrantless search of private premises, but yet there exists a significant possibility that critical evidence would be lost in the time it would take to obtain a search warrant by traditional means.

Fed.R.Crim.P. 41(c)(2) advisory committee note (1977).

I realize that despite the findings by the Second Circuit that the entries into and control over the *Agapito* and *Segura* residences were unlawful, it did not suppress the evidence seized from the homes. In

---

**2.** *Compare United States v. Rubin,* 474 F.2d 262, 269 (3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973) (arrestee apprehended in neighborhood of his home and in presence of people he knew, yelled "Call my brother"; this, with other circumstances, raised great likelihood arrestee's confederates at his home would be alerted to arrest and destroy evidence).

*United States v. Agapito,* 620 F.2d at 338, it reasoned that "[a]lthough the agents seized the suitcase in Room 1701 which contained the cocaine, they did not open it until after the warrant had been obtained. The one kilogram of cocaine, therefore, was admissible if the warrant was valid." With due respect, I do not think an illegal seizure can be cured by a warrant subsequently obtained. *Katz v. United States,* 389 U.S. at 356, 88 S.Ct. at 514. There is no basis in fourth amendment jurisprudence for this back door approach.

I believe the Ninth Circuit's resolution of this question comports more closely with the spirit and purpose of the fourth amendment. The Ninth Circuit has consistently ruled "[w]e draw no Fourth Amendment distinction between 'searches' and 'seizures' of residences. Seizures of residences, like searches, require a warrant unless exigent circumstances are present." *United States v. Lomas,* 706 F.2d 886, 893 (9th Cir.1983); *United States v. Kunkler,* 679 F.2d 187, 189 n. 1 (9th Cir.1982).[3]

The Supreme Court has never recognized a "securing the premises in anticipation of a search warrant," exception to the warrant requirement of the fourth amendment. Obviously, such an exception cannot coexist with the precedents established in the almost six decades of fourth amendment jurisprudence which have followed *Agnello.* Such an exception would necessarily swallow the rule. The warrant requirement protects the privacy of the home by "interpos[ing] a magistrate between the citizen and the police ... so that an objective mind might weigh the need to invade that privacy in order to enforce the law." *McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). Undoubtedly, it would be easier and more efficacious for police to enter and "secure" homes pending a magistrate's determination of whether a warrant should issue,

[b]ut the Fourth Amendment reflects the view of those who wrote the Bill of Rights that privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.

*Mincey v. Arizona,* 437 U.S. at 393, 98 S.Ct. at 2414 (1978). Failure to suppress the evidence obtained from the Palumbo home results in exploitation of illegal conduct and eviscerates the fourth amendment.

My brothers seek to buttress their decision by falling back on the independent source rule. With due respect, I think they misconstrue and misapply this rule. The rule has its roots in *Silverthorne Lumber Company, Inc. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). That case involved an illegal examination and copying of the books, papers, and documents of defendant. Based on the information thus obtained, a new indictment was drawn and subpoenas issued for the original documents. Justice Holmes stated:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Id.* at 392, 40 S.Ct. at 183. This obviously means that if a third party had told the government about the material, a subpoena could lawfully have been issued for them.

In the context of this case, an independent source might have been a neighbor of the Palumbos who had visited the house, seen the implicating material, and informed the police. I have found no cases, how-

---

**3.** The Sixth Circuit appears to have preceded the Ninth Circuit in so ruling on this issue but its initial holding is left in some doubt after a more recent case. *Compare United States v. Griffin,* 502 F.2d 959 (6th Cir.1974), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974) *with United States v. Korman,* 614 F.2d 541 (6th Cir.) (divided panel), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980).

ever, suggesting that an independent source could be the officers' probable cause belief that implicating evidence was on the premises.

Nor do I think that *United States v. Bienvenue*, 632 F.2d 910 (1st Cir.1980) applies. There, we found that the police, as a matter of investigative routine, would inevitably have discovered the evidence regardless of the initial illegal search. Here, the evidence was seized illegally as part of the initial seizure of the house. There was no possibility of obtaining the same evidence elsewhere from another source, as in *Bienvenue*.

Moreover, in *Bienvenue* the Government specifically advanced the independent source rule and the inevitable discovery theory below and before us. Here, the Government depended solely on exigent circumstances as justification for its seizure of the house. The majority's determination that the exigent circumstances were "rather thin" has forced them to invoke a rule not briefed or argued by the parties. I would point out also that if the independent source rule is to be applied, the critical issue of whether it was shown that the evidence would have been found independently is one in the first instance for the district court. *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir.1983).

*Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), presents a much stronger case for the application of the majority's independent source *cum* inevitable discovery rule were such application within the realm of fourth amendment jurisprudence. There the police were validly inside the defendant's apartment during an authorized drug bust. Gunfire came from the direction of the defendant who was in another room, fatally wounding one police officer. This homicide was only one of several serious crimes committed in the actual presence of the police. The information forming the probable cause to search Mincey's apartment for evidence of these crimes was, therefore, far beyond the probable cause belief the police officers possessed here that relevant evidence existed

within the Palumbo residence. After a homicide squad's arrival, the police began its investigation of Mincey's residence and gathered evidence over four days. No warrant was ever obtained. Under the majority construction of the independent source/inevitable discovery rules, none of the evidence found as a result of the warrantless search and seizure of Mincey's apartment should have been suppressed because the officers' knowledge that crimes had been committed made them their own independent sources. Further, given the police dominion over the residence after the crimes had been committed, the evidence would inevitably have been discovered. The Supreme Court, however, unanimously suppressed the evidence and declined to find a species of a probable cause exception to the warrant requirement. *Id.* at 390, 98 S.Ct. at 2412. In examining the proferred arguments justifying a murder-scene exception to the warrant requirement, the Court said: "It is one thing to say that one who is legally taken into police custody has a lessened right of privacy in his person. It is quite another to argue that he also has a lessened right of privacy in his entire house." *Id.* at 391, 98 S.Ct. at 2413 (citations omitted). Other arguments were similarly rejected. I do not believe that it makes any difference that in *Mincey* a warrant was never obtained. The rule is that searches and seizures "conducted outside the judicial process, without *prior* approval of a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few ... well-delineated exceptions." *Id.* at 390, 98 S.Ct. at 2412 (quoting *Katz v. United States* ) (first emphasis added).

The question is not as my brothers put it of whether bad conduct should be allowed to spill over and affect consequences of truly independent good conduct. Majority Opinion at 32. Rather, the question is whether a warrantless entry, search and seizure of a home is to be forgiven because the police had probable cause, but with no exigent circumstances acted without having the warrant in hand. My brothers have carved out another exception to the war-

rant requirement of the fourth amendment: if probable cause exists and the application process for a warrant has begun, a warrantless entry, search and seizure become valid retroactively when the warrant arrives. I cannot agree. This may help convict criminals, but it violates the fourth amendment. I respectfully dissent.

## OPINION FOR REHEARING

PER CURIAM.

Following our opinion herein, reported 730 F.2d 28 (2–1), defendant moved for rehearing. We reserved action on the motion pending the Supreme Court's opinion on the somewhat similar case of *Segura v. United States*, then under advisement. *Segura* has now come down, — U.S. —, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

■ *Segura* makes clear that the panel decision was correct. An unauthorized[1] seizure of premises, which includes the contents, known and unknown, does not require the exclusion from evidence of items subsequently discovered if their discovery is traceable to a lawful independent source, not contributed to by, or the fruit of, any improper conduct. The fact that the same officers were involved does not mean it was not independent; independent source means independent of unlawful conduct, not independent individuals.

The *Segura* court did not consider the consequences if the seizure itself, by preventing loss or destruction of the property by freezing it in situ, might contribute to the discovery, except to require more than speculation that this was the fact. That question is not presented in the case at bar.

The Petition for rehearing is denied.

On the same day, the petition for rehearing en banc is denied, on the basis of the Per Curiam opinion denying rehearing by the panel.

---

1. The Chief Justice, who authored the "opinion for the Court," was joined by Justice O'Connor, only, in regarding the *Segura* seizure as lawful because probable cause for a warrant existed,

and a warrant was being sought, although there were no exigent circumstances presaging loss or destruction of the property. This difference of view is of no present consequences.